IN RE: THE INVESTIGATION OF THE DEATH OF ERIC DEWAYNE MILLER AND OF ANY INFORMATION IN THE POSSESSION OF ATTORNEY RICHARD T. GAMMON REGARDING THAT DEATH

No. 303PA02

(Filed 22 August 2003)

**1. Jurisdiction— petition in the nature of special proceeding—review of communications with attorney**

The trial court had jurisdiction to hear a "Petition in the Nature of a Special Proceeding" filed by the State seeking review of communications between an attorney and his now-deceased client relevant to the criminal investigation of a third party. Jurisdiction presupposes the existence of a court with control over a subject matter and the superior courts routinely address matters of privilege and protected information. Although this proceeding was not initiated in strict accord with statutory procedures, common law flexibility permits the superior court to assume jurisdiction in proceedings of an extraordinary nature that do not fit neatly within statutory parameters.

**2. Attorneys; Evidence— privileged communication—death of client**

The attorney-client privilege survives the client's death.

**3. Estates— defense of estate—no claim by or against estate—waiver of attorney-client privilege**

The statute allowing an executrix to defend an estate, N.C.G.S. § 32-27(23), was not applicable where there was no claim by or against the estate, although the executrix submitted an affidavit purporting to waive the attorney-client privilege for the estate in a murder investigation.

**4. Estates; Evidence— attorney-client privilege—not waivable by executrix**

N.C.G.S. § 32-27 does not empower an executor or executrix to waive a decedent's attorney-client privilege.

**5. Estates; Evidence— attorney-client privilege—power to waive—not granted by will**

An executrix did not have the power to waive the deceased's attorney-client privilege where the will did not expressly grant her that power or any similar power. Although the State argued

IN RE INVESTIGATION OF DEATH OF ERIC MILLER

[357 N.C. 316 (2003)]

that the executrix had re-opened the closed estate to waive the privilege in exchange for a release from civil liability by the family of a murder victim, the estate had been closed and had no assets, and the State's contention that the affidavit was filed for the benefit of the estate was not persuasive. Furthermore, N.C.G.S. § 28A-13-3(a) is inapplicable because its listing of the powers of an executrix implies the exclusion of powers not listed.

**6. Attorneys— privileged communication—no balancing test for compelling disclosure**

A proposed balancing test for compelling disclosure of communications between a client and an attorney was not appropriate. A balancing test would invite procedures and applications so lacking in standards, direction and scope that the privilege in practice would be lost to the exception.

**7. Attorneys— privileged communication—not absolute**

The primary goal of our adversarial system of justice is to ascertain the truth. While the attorney-client privilege is an essential component of our system of justice, the privilege is not absolute.

**8. Attorneys— privileged communication—in camera review appropriate**

The attorney-client privilege does not apply to all communications between an attorney and client and the responsibility for determining whether the privilege applies belongs to the court rather than the attorney. An in camera review of the content of the communication may be necessary because it is often impossible for the court to make its determination without knowing the substance of that communication. The trial court did not err in this murder prosecution by ordering the attorney of a deceased third party to provide the trial court with a sealed affidavit relating communications with his client so that the court could determine whether the attorney-client privilege applies.

**9. Attorneys— privileged communication—scope**

Communications between attorney and client about the criminal activity of a third party which do not tend to harm the interests of the client are not privileged and may be disclosed. However, the circumstances surrounding the client at the time he communicated with counsel should be considered; in this case,

IN RE INVESTIGATION OF DEATH OF ERIC MILLER

[357 N.C. 316 (2003)]

the client presumably knew that he was a suspect in a murder investigation and statements in which he implicated himself as well as the third party were covered by the privilege.

**10. Attorneys— privileged communication—disclosure—conditions**

A rule or privilege should cease to apply when the justification for the rule or privilege is not furthered by its continued application. A client's wish that a communication with an attorney remain confidential is premised upon the possibility that disclosure might result in criminal liability, that disclosure might subject the client (or the client's estate) to civil liability, or that disclosure might harm the client's loved ones or his reputation. If the trial court should determine after an in camera review that any of these conditions apply, the communications should remain undisclosed. However, the purpose for the privilege no longer exists if the communications would have no negative impact on the client's interests.

**11. Attorneys— privileged communication—in camera reviews—not fishing expeditions**

The approval of in camera reviews of communications alleged to be within the attorney-client privilege in no way sanctions special proceedings or grand jury investigations as fishing expeditions.

On discretionary review pursuant to N.C.G.S. § 7A-31(b), prior to a review by the Court of Appeals, of an order requiring disclosure of communications between attorney and client entered 7 March 2002 by Judge Donald W. Stephens in Superior Court, Wake County. Heard in the Supreme Court 15 October 2002.

*Poyner & Spruill LLP, by David W. Long and Joseph E. Zeszotarski, Jr., for the respondent-appellant.*

*Roy Cooper, Attorney General, by William B. Crumpler, Assistant Attorney General; and C. Colon Willoughby, District Attorney, Tenth Prosecutorial District, for the State-appellee.*

LAKE, Chief Justice.

This case involves the attorney-client privilege and raises the primary question of whether, in the context of a pretrial criminal investigation, there can be a viable basis for the application of an interest

IN RE INVESTIGATION OF DEATH OF ERIC MILLER

[357 N.C. 316 (2003)]

of justice balancing test or an exception to the privilege which would allow a trial court to compel disclosure of confidential communications where the client is deceased, an issue of first impression for this Court.

On 2 December 2000, Eric D. Miller (Dr. Miller) died at Rex Hospital in Raleigh, North Carolina, as a result of arsenic poisoning. Investigation by law enforcement officials established the following: Dr. Miller was a post-doctoral research scientist and was married to Ann Rene Miller (Mrs. Miller). On the evening of 15 November 2000, Dr. Miller went bowling at AMF Bowling Center in Raleigh, North Carolina, with several of Mrs. Miller's co-workers. While at the bowling alley, Dr. Miller partially consumed a cup of beer given to him by Mrs. Miller's co-worker Derril H. Willard (Mr. Willard). Dr. Miller commented to those present that the beer had a bad or "funny" taste.

On 16 November 2000, Dr. Miller was hospitalized at Rex Hospital in Raleigh with symptoms later determined to be consistent with arsenic poisoning. Five days later, Dr. Miller was transferred to North Carolina Memorial Hospital in Chapel Hill, North Carolina, where he remained until discharge on 24 November 2000. Dr. Miller was physically unable to return to work and remained at home under the care of Mrs. Miller and his parents. Dr. Miller slowly regained his physical strength until the morning of 1 December 2000, when he became violently ill and was again hospitalized. On 2 December 2000, Dr. Miller died from arsenic poisoning.

Within one week of Dr. Miller's death, law enforcement officials interviewed all of the persons present at the bowling alley the night Dr. Miller consumed the suspect beer, with the exception of Mr. Willard. The police were unable to interview Mr. Willard. Mrs. Miller was interviewed on the day of her husband's death and stated that she had no idea why anyone would have poisoned Dr. Miller. Shortly after the autopsy was completed on Dr. Miller's body, it was cremated at the direction of Mrs. Miller. All of the investigators' subsequent requests to interview Mrs. Miller were rejected.

During the course of the investigation, law enforcement officials concluded that Mrs. Miller was involved in a relationship with her co-worker, Mr. Willard. Investigators subpoenaed telephone records for Mrs. Miller's home, office, and cellular phones for a period of time before the initial hospitalization of Dr. Miller until the day he died. An analysis of telephone records showed several calls between Mr.

IN RE INVESTIGATION OF DEATH OF ERIC MILLER

[357 N.C. 316 (2003)]

Willard and Mrs. Miller, with a total of 576 total minutes of conversation. The evidence also showed an increase in the frequency and duration of these telephone calls immediately before and after the incident which occurred at the bowling alley. In addition, numerous e-mail messages between Mrs. Miller and Mr. Willard were found on Mrs. Miller's computer. During interviews with Yvette B. Willard (Mrs. Willard), the wife of Mr. Willard, investigators learned that Mr. Willard had acknowledged his romantic involvement with Mrs. Miller.

Shortly after Dr. Miller's death, Mr. Willard sought legal counsel from criminal defense attorney Richard T. Gammon (respondent), who, according to an affidavit of Mrs. Willard, advised Mr. Willard that he could be charged with the attempted murder of Dr. Miller. Within days after his meeting with respondent, Mr. Willard committed suicide. Mr. Willard left a will naming Mrs. Willard as the executrix of his estate.

On 20 February 2002, the State filed a "Petition in the Nature of a Special Proceeding" in Superior Court, Wake County, requesting that the trial court conduct a hearing and, if needed, an *in camera* examination to determine whether the attorney-client privilege should be waived or whether compelled disclosure of communications between respondent and Mr. Willard was warranted for the "proper administration of justice." On the same day, upon consideration of the petition and affidavit of Mrs. Willard filed therewith, the Honorable Donald W. Stephens, Senior Resident Superior Court Judge, entered an order requiring respondent to respond and appear before the Wake County Superior Court for a hearing on the petition. Respondent filed a motion to dismiss the petition asserting that the court lacked jurisdiction, which motion was denied.

On 7 March 2002, after a hearing, the trial court entered an order granting the State's petition and requiring respondent to provide the trial court with a sealed affidavit containing information relevant to the murder investigation into the death of Dr. Miller that was obtained from his attorney-client relationship with Mr. Willard. The order provided that the trial court would conduct an *in camera* review of the information contained in respondent's affidavit to determine if the interest of justice required disclosure of the information to the State. On 13 March 2002, the trial court entered an order staying compliance with the 7 March 2002 order pending appeal. The trial court's order designated the matter as immediately appealable. Respondent filed a notice of appeal to the Court of

## IN RE INVESTIGATION OF DEATH OF ERIC MILLER

[357 N.C. 316 (2003)]

Appeals. On 27 June 2002, this Court allowed the parties' joint petition for discretionary review prior to determination by the Court of Appeals.

In essence, this case presents the question of whether, during a criminal investigation, there can be a legal basis for the application of an interest of justice balancing test or an exception to the attorney-client privilege which would allow a trial court to compel the disclosure of confidential attorney-client communications when the client is deceased. The State asserts basically two propositions in support of disclosure: (1) that a deceased client's personal representative may waive the confidentiality of the communications, and (2) that in the interest of justice a trial court has the inherent authority to hear the State's petition and to apply a balancing test to determine by *in camera* review whether any disclosure should be made.

**[1]** Respondent asserts that the trial court first erred in denying his motion to dismiss on the ground that the court has no jurisdiction to hear this proceeding because of the manner in which it was instituted by the district attorney. Respondent contends that the only proper procedure for presenting this issue was before a grand jury, where, upon the assertion of the privilege, the issue would have to proceed further to a judge of the superior court for resolution. N.C.G.S. § 15A-623(h) (2001). We turn first to this consideration.

The parties agree that the State has initiated this matter as a cause in the nature of a special proceeding, N.C.G.S. § 1-2 (2001); N.C.G.S. § 1-3 (2001), and we note that while this action was not commenced in strict accord with the usual process as set forth in the North Carolina General Statutes, N.C.G.S. § 1-394 (2001); N.C.G.S. § 1A-1, Rule 3 (2001), it was initiated in the proper forum for special proceedings, the superior court, N.C.G.S. § 7A-246 (2001). Jurisdiction presupposes the existence of a court that has "control over a subject matter which comes within the classification limits designated by the constitutional authority or law under which the court is established and functions." *Jones v. Brinson*, 238 N.C. 506, 509, 78 S.E.2d 334, 337 (1953); *see also Perry v. Owens*, 257 N.C. 98, 101-02, 125 S.E.2d 287, 290 (1962); *State v. Hall*, 142 N.C. 710, 713, 55 S.E. 806, 807 (1906). Subject matters of privilege and protected information, such as the Fifth Amendment privilege against self-incrimination and issues arising out of discovery motions, are subjects which are routinely addressed within the jurisdiction of the superior court.

**IN RE INVESTIGATION OF DEATH OF ERIC MILLER**

[357 N.C. 316 (2003)]

Although this proceeding was not initiated in strict accord with statutory procedures as set forth in N.C.G.S. § 1A-1, Rule 3, or by convening an "investigative grand jury," N.C.G.S. § 15A-622(h) (2001), our common law, as reflected throughout its development, demonstrates a practical flexibility and ingenuity to accommodate exigent circumstances where required in the interest of justice. This flexibility, as a virtual rule of necessity, will permit the superior court to assume jurisdiction in proceedings of an extraordinary nature that do not fit neatly within statutory parameters. This premise is well stated by former Judge (later Chief Justice) Burley Mitchell in the following language:

> Within the guidelines of our Constitution, the legislature is charged with the responsibility of providing the necessary procedures for the proper commencement of a matter before the courts. Occasionally, however, the proscribed procedures of a statutory scheme fail to embrace the unanticipated and extraordinary proceeding such as that disclosed by the record before us. In similar situations, it has been long held that courts have the inherent power to assume jurisdiction and issue necessary process in order to fulfill their assigned mission of administering justice efficiently and promptly. We believe that this is one of those extraordinary proceedings and that our rules of procedure should not be construed so literally as to frustrate the administration of justice.

*In re Albemarle Mental Health Ctr.*, 42 N.C. App. 292, 296, 256 S.E.2d 818, 821, *disc. rev. denied*, 298 N.C. 297, 259 S.E.2d 298 (1979).

With respect to the inherent power of the superior court to issue an order in such circumstances, this Court has stated: "It is sufficient to note that situations occasionally arise where the prompt and efficient administration of justice requires that the superior court issue an order of the type sought here by the State." *In re Superior Court Order*, 315 N.C. 378, 380, 338 S.E.2d 307, 309 (1986). We thus conclude that in the instant case, pursuant to the petition filed by the State, the superior court had jurisdiction to hear and consider the merits of the State's petition.

[2] Before turning to the trial court's determination and the merits of the State's position, we consider the collateral issue of whether the attorney-client privilege survives the client's death.

**IN RE INVESTIGATION OF DEATH OF ERIC MILLER**

[357 N.C. 316 (2003)]

While this Court has never specifically addressed this issue, this Court has presumed that the attorney-client privilege extends after a client's death by acknowledging the existence of the "testamentary exception" to the privilege. *In re Will of Kemp*, 236 N.C. 680, 73 S.E.2d 906 (1953). In recognizing the "testamentary exception," this Court has stated:

> "[I]t is generally considered that the rule of privilege does not apply in litigation, after the client's death, between parties, all of whom claim under the client; and so, where the controversy is to determine who shall take by succession the property of a deceased person and both parties claim under him, neither can set up a claim of privilege against the other as regards the communications of deceased with his attorney." 70 C.J., Witnesses, section 587.

*Kemp*, 236 N.C. at 684, 73 S.E.2d at 910; *see also* 1 Kenneth S. Broun, *Brandis and Broun on North Carolina Evidence* § 129, at 129 (5th ed. 1998) (the testamentary exception to the attorney-client privilege applies "[w]hen, after the client's death, there is litigation, such as a will contest, in which all parties claim under the client").

The United States Supreme Court has also recognized the testamentary exception and has assumed that, based upon this exception, the attorney-client privilege continues after a client's death. *Swidler & Berlin v. United States*, 524 U.S. 399, 405, 141 L. Ed. 2d 379, 385 (1998) (citing *Glover v. Patten*, 165 U.S. 394, 407-08, 41 L. Ed. 760, 768 (1897)). The rationale for permitting disclosure under these circumstances is that it furthers the client's intent. *Id.*

Moreover, many jurisdictions have explicitly held that the attorney-client privilege survives the death of the client. *See, e.g., State v. Macumber*, 112 Ariz. 569, 544 P.2d 1084 (1976); *Wesp v. Everson*, 33 P.3d 191 (Colo. 2001); *Mayberry v. State*, 670 N.E.2d 1262 (Ind. 1996); *District Attorney for Norfolk Dist. v. Magraw*, 417 Mass. 169, 628 N.E.2d 24 (1994); *McCaffrey v. Estate of Brennan*, 533 S.W.2d 264 (Mo. App. 1976); *Taylor v. Sheldon*, 172 Ohio St. 118, 173 N.E.2d 892 (1961); *Curato v. Brain*, 715 A.2d 631 (R.I. 1998); *South Carolina State Highway Dep't v. Booker*, 260 S.C. 245, 195 S.E.2d 615 (1973); *see also* 1 John W. Strong, *McCormick on Evidence* § 94, at 378 (Kenneth S. Broun et al. eds., 5th ed. 1999) [hereinafter *McCormick on Evidence*]. Consistent with these authorities and *In re Will of Kemp*, we hold that the attorney-client privilege does survive the death of the client.

**[3]** Turning now to the State's first contention, the State asserts that Mrs. Willard, as executrix of Mr. Willard's estate, effectively waived "any attorney-client privilege that may have existed" by submitting an affidavit purporting to waive the privilege on Mr. Willard's behalf. The State specifically argues that, as executrix of Mr. Willard's estate, Mrs. Willard was empowered to waive the privilege pursuant to two sections of the North Carolina General Statutes, section 32-27 (powers which may be incorporated by reference in a trust instrument) and section 28A-13-3 (powers of a personal representative or fiduciary). N.C.G.S. §§ 32-27, 28A-13-3 (2001). The trial court held that the estate of Mr. Willard waived the attorney-client privilege based upon the fact that Mr. Willard did not specifically take actions to preclude his estate from waiving the privilege upon his death.

Mr. Willard died leaving behind a will which named Mrs. Willard as executrix of his estate. Article VII of Mr. Willard's will sets forth the powers granted to the executor. Among those powers are (1) the power to "deal with any property" in the estate, including the power to make tax elections; and (2) all of the powers contained in N.C.G.S. § 32-27. Whether N.C.G.S. §§ 32-27 and 28A-13-3 apply to the instant case is a matter of statutory construction.

The primary goal of statutory construction is to "ensure that the purpose of the legislature is accomplished." *Woodson v. Rowland*, 329 N.C. 330, 338, 407 S.E.2d 222, 227 (1991); *see also State ex rel. Hunt v. North Carolina Reinsurance Facil.*, 302 N.C. 274, 288, 275 S.E.2d 399, 405 (1981). " '[W]here the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must give it its plain and definite meaning, and are without power to interpolate, or superimpose, provisions and *limitations* not contained therein.' *State v. Camp*, 286 N.C. 148, 152, 209 S.E.2d 754, 756 (1974) (quoting 7 Strong's North Carolina Index 2d *Statutes* § 5 (1968))." *Hlasnick v. Federated Mut. Ins. Co.*, 353 N.C. 240, 244, 539 S.E.2d 274, 277 (2000); *see also Burgess v. Your House of Raleigh, Inc.*, 326 N.C. 205, 209, 388 S.E.2d 134, 136 (1990).

Section 32-27(23) of the North Carolina General Statutes, titled "Litigate, Compromise or Abandon," empowers the executor "[t]o *compromise, adjust, arbitrate, sue on or defend, abandon, or otherwise deal with and settle claims in favor of or against the estate.*" N.C.G.S. § 32-27(23) (emphasis added). The State argues that the authority to "defend" implies the authority to gain knowledge of the decedent's recent confidential communications to his attorney when pertinent to the defense of the estate.

**IN RE INVESTIGATION OF DEATH OF ERIC MILLER**

[357 N.C. 316 (2003)]

In the instant case, no claim has been inferred, threatened or made by or against Mr. Willard's estate. As a result, we do not interpret Mrs. Willard's actions as those taken to "defend" Mr. Willard's estate. This case comes before us as a "Petition in the Nature of a Special Proceeding," instituted by the State in an effort to gain alleged attorney-client privileged information held by respondent. Because there is no claim by or against Mr. Willard's estate, there is no basis for any defense of the estate, and we hold that N.C.G.S. § 32-27(23) is inapplicable.

**[4]** In addition to subsection (23), there are thirty-three additional powers enumerated in N.C.G.S. § 32-27 which were granted to Mrs. Willard pursuant to Mr. Willard's will. The clear wording of these provisions reveal that they are in no way applicable, and we thus find that none of these remaining powers grant an executrix the power to waive the decedent's attorney-client privilege. "Under the doctrine of *expressio unius est exclusio alterius*, when a statute lists the situations to which it applies, it implies the exclusion of situations not contained in the list."[1] *Evans v. Diaz*, 333 N.C. 774, 779-80, 430 S.E.2d 244, 247 (1993); *see also Campbell v. First Baptist Church*, 298 N.C. 476, 482, 259 S.E.2d 558, 563 (1979). We find no basis under any concept of statutory construction to support the State's position on this point and thus hold that N.C.G.S. § 32-27 does not empower an executor or executrix to waive a decedent's attorney-client privilege.

**[5]** The State further asserts that Mrs. Willard had the power to waive the attorney-client privilege pursuant to the power granted to the personal representative of a decedent's estate in N.C.G.S. § 28A-13-3(a). Specifically, the State argues that because N.C.G.S. § 28A-13-3(a)(15) confers upon the executor the power to handle litigation on behalf of the estate, the executor also possesses, by necessary implication, the

---

1. We find it noteworthy that whereas many jurisdictions have enacted provisions empowering a personal representative to claim and exercise (and by necessary inference also waive) the decedent's attorney-client privilege, the North Carolina General Assembly has enacted no such provision. *See* Alaska R. Evid. 503(c) (2002); Ark. Code Ann. § 16-41-101, Rule 502(c) (2002); Cal. Evid. Code § 953(c) (Deering 2003); Del. R. Evid. 502(c) (2002); Fla. Stat. Ann. § 90.502(3)(c) (2002); Haw. Rev. Stat. Ann. § 503(c) (Michie 2002); Idaho R. Evid. 502(c) (2002); Kan. Stat. Ann. § 60-426(b)(3)(iii) (2001); Ky. R. Evid. 503(c) (2002); Me. R. Evid. 502(c) (2002); Neb. Rev. Stat. § 27-503(3) (2002); Nev. Rev. Stat. 49.105(1) (2002); N.H. R. Evid. 502(c) (2002); N.J. Stat. Ann. § 2A:84A-20(1) (2002); N.M. R. Evid. 11-503(C) (2002); N.D. R. Evid. 502(c) (2002); Okla. Stat. tit. 12, § 2502(C) (2003); Or. Rev. Stat. § 40.225, R. 503(3) (2001); S.D. Codified Laws § 19-13-4 (Michie 2002); Tex. R. Evid. 503(c) (2002); Utah R. Evid. 504(c) (Michie 2002); Vt. R. Evid. 502(c) (2002); Wis. Stat. Ann. § 905.03(3) (2002).

power to waive confidentiality when the information to be gained may be critical to litigation involving the estate.

Section 28A-13-3 of the North Carolina General Statutes contains the "[p]owers of a personal representative or fiduciary." This section empowers a personal representative

> to perform in a reasonable and prudent manner every act which a reasonable and prudent man would perform *incident to the collection, preservation, liquidation or distribution of a decedent's estate so as to accomplish the desired result of settling and distributing the decedent's estate* in a safe, orderly, accurate and expeditious manner as provided by law, including but not limited to the powers [set out in this subsection].

N.C.G.S. § 28A-13-3(a) (emphasis added). Among the thirty-three specific powers N.C.G.S. § 28A-13-3 grants an executor or executrix, subsection (a)(15) confers the power "[t]o compromise, adjust, arbitrate, sue on or defend, abandon, or otherwise deal with and settle claims in favor of or against the estate." N.C.G.S. § 28A-13-3(a)(15). The State contends that this provision empowers Mrs. Willard, as executrix, to waive the attorney-client privilege on behalf of Mr. Willard.

In this regard, Mrs. Willard, acting as executrix of Mr. Willard's estate, reopened the estate "to handle legal matters" two days before the State filed its petition. At that time, the estate had been closed; it contained no assets; and as far as the record shows, there were no claims pending for or against the estate. Therefore, Mr. Willard's estate was not at risk of incurring civil liability. Because there were no assets in the estate, there was nothing for the executrix to collect, preserve, liquidate, or distribute. *See* N.C.G.S. § 28A-13-3(a).

The State nevertheless argues that Mrs. Willard filed her affidavit in an effort to protect the estate from civil liability arising from possible actions by the Miller family and that her action therefore fell within the purview of N.C.G.S. § 28A-13-3(a). Specifically, the State contends that because the Miller family released the estate from liability, "[i]t defies logic that the Millers acted unilaterally and without consideration. The most compelling logic is that the Millers' release was an agreed upon response to the waiver by Mrs. Willard." The State thus contends that the only way the estate of Mr. Willard could protect itself from the possibility of a civil lawsuit by the Miller family was to reopen the estate and execute an affidavit purporting to

waive the privilege as a condition precedent to the Millers' release of liability.

While enticing, we do not find this argument persuasive in light of the facts established in the record as a whole. We find it more plausible that the estate was not reopened in consideration of the Millers' release of civil liability since Mrs. Willard's affidavit was executed one week *before* the release was obtained. In addition, the actual document which purports to release Mr. Willard's estate from liability specifically states that such release was made "in consideration for the sum of one dollar." Nowhere in the document does it mention the affidavit executed by Mrs. Willard. As previously discussed, we find it relevant that Mr. Willard's estate had no assets at the time Mrs. Willard reopened it and executed her affidavit.

Accordingly, we find that the State's attempts to establish that the filing of Mrs. Willard's affidavit was for the benefit of Mr. Willard's estate are not persuasive. To the contrary, the record more strongly suggests that Mr. Willard's estate was reopened in order to enable Mrs. Willard to submit an affidavit to further the ongoing criminal investigation, and that Mrs. Willard's decision to waive the attorney-client privilege was not for a purpose related to the preservation of Mr. Willard's estate. Further, by again applying the doctrine of *expressio unius est exclusio alterius*, we hold that N.C.G.S. § 28A-13-3(a) is inapplicable to the instant case. We therefore conclude that because Mr. Willard's will did not expressly grant the executrix the power to waive his attorney-client privilege, or any powers similar thereto, Mrs. Willard does not have the power to waive Mr. Willard's attorney-client privilege.

[6] In its second basic contention, the State asserts that the trial court properly accepted the premise of a balancing test. The State argues that the information sought from respondent is not available from any other source, that the relief granted the State is narrow in that an *in camera* review by the trial court must occur before the State has access to any of the information, and that disclosure under such circumstances and procedure will cause no substantial harm to the attorney-client privilege and all that such privilege embodies.

After weighing the State's arguments for the public's interest in justice in the instant case against respondent's arguments for the public's interest in protecting the privilege, and before conducting an *in camera* review, the trial court concluded:

**IN RE INVESTIGATION OF DEATH OF ERIC MILLER**

[357 N.C. 316 (2003)]

[T]he State's and the public's interest in determining the identity of the person or persons responsible for the death of Eric Miller outweigh the public interest in protecting . . . the attorney-client privilege.

The public's interest in protecting the attorney-client privilege is no trivial consideration, as this protection for confidential communications is one of the oldest and most revered in law. The privilege has its foundation in the common law and can be traced back to the sixteenth century. Lloyd B. Snyder, *Is Attorney-Client Confidentiality Necessary?*, XV Geo. J. Legal Ethics 477, at 480 (Spring 2002); 8 John H. Wigmore, *Evidence* § 2290, at 542 (John T. McNaughton ed. 1961) (citing *Berd v. Lovelace*, 21 Eng. Rep. 33 (1577)). The attorney-client privilege is well-grounded in the jurisprudence of this State. *State v. McIntosh*, 336 N.C. 517, 523, 444 S.E.2d 438, 441 (1994); *State v. Tate*, 294 N.C. 189, 192, 239 S.E.2d 821, 824 (1978); *Carey v. Carey*, 108 N.C. 267, 270, 12 S.E. 1038, 1038 (1891). "[W]hen the relationship of attorney and client exists, all confidential communications made by the client to his attorney on the faith of such relationship are privileged and may not be disclosed." *McIntosh*, 336 N.C. at 523, 444 S.E.2d at 441 (citing *State v. Ballard*, 333 N.C. 515, 428 S.E.2d 178, *cert. denied*, 510 U.S. 984, 126 L. Ed. 2d 438 (1993)); *see also State v. Murvin*, 304 N.C. 523, 531, 284 S.E.2d 289, 294 (1981); *State v. Van Landingham*, 283 N.C. 589, 601, 197 S.E.2d 539, 547 (1973); *Guy v. Avery Cty. Bank*, 206 N.C. 322, 322, 173 S.E. 600, 601 (1934); *Hughes v. Boone*, 102 N.C. 137, 159, 9 S.E. 286, 292 (1889).

There are exceptions to this general rule of application to all communications between a client and his attorney; however, the facts of this case do not fall under any one of the well-established exceptions. *See, e.g.*, *McIntosh*, 336 N.C. at 524, 444 S.E.2d at 442 (where uncontroverted evidence showed the defendant consulted with his attorney solely to facilitate his surrender, such communication relating to the surrender was not privileged); *State v. Taylor*, 327 N.C. 147, 152, 393 S.E.2d 801, 805 (1990) (when a client alleges ineffective assistance of counsel, the client waives the attorney-client privilege as to the matters relevant to the allegation); *State v. Brown*, 327 N.C. 1, 21, 394 S.E.2d 434, 446 (1990) (communications are not privileged when made in the presence of a third person not acting as an agent of either party); *In re Will of Kemp*, 236 N.C. at 684, 73 S.E.2d at 909-10 (the privilege is not applicable when an attorney testifies regarding the testator's intent to settle a dispute over an estate).

IN RE INVESTIGATION OF DEATH OF ERIC MILLER

[357 N.C. 316 (2003)]

The rationale for having the attorney-client privilege is based upon the belief that only "full and frank" communications between attorney and client allow the attorney to provide the best counsel to his client. *Upjohn Co. v. United States*, 449 U.S. 383, 389, 66 L. Ed. 2d 584, 591 (1981); *see also McIntosh*, 336 N.C. at 523, 444 S.E.2d at 442. The privilege " 'rests on the theory that encouraging clients to make the fullest disclosure to their attorneys enables the latter to act more effectively, justly and expeditiously—benefits out-weighing the risks of truth-finding posed by barring full disclosure in court.' " *Ballard*, 333 N.C. at 522, 428 S.E.2d at 182 (quoting *United States ex rel. Edney v. Smith*, 425 F. Supp. 1038, 1046 (E.D.N.Y. 1976), *aff'd without opinion*, 556 F.2d 556 (2d Cir.), *cert. denied*, 431 U.S. 958, 53 L. Ed. 2d 276 (1977)).

In considering whether an attorney can be compelled to disclose confidential attorney-client communications, it is noteworthy that unlike other profession-related, privileged communications, the attorney-client privilege has not been statutorily codified. In article 7 of chapter 8 of our General Statutes, relating to competency of witnesses, the General Assembly has specifically addressed a method for disclosure of privileged communications. In N.C.G.S. § 8-53, the General Assembly has established the privilege for confidential communications between physician and patient, providing that confidential information obtained in such a relationship shall be furnished only on the authorization of the patient or, if deceased, the executor, administrator or next of kin of the patient. This statute further provides that "[a]ny resident or presiding judge in the district, either at the trial or prior thereto, or the Industrial Commission pursuant to law may, subject to [N.C.G.S. §] 8-53.6, compel disclosure if in his opinion disclosure is necessary to a proper administration of justice." N.C.G.S. § 8-53 (2001). Our General Assembly has also provided this same disclosure procedure and basis in its creation of the privilege for communications between psychologist and patient (N.C.G.S. § 8-53.3 (2001)), in the school counselor privilege (N.C.G.S. § 8-53.4 (2001)), in the marital and family therapy privilege (N.C.G.S. § 8-53.5 (1999)), in the social worker privilege (N.C.G.S. § 8-53.7 (1999)), in the professional counselor privilege (N.C.G.S. § 8-53.8 (2001)), and in the optometrist-patient privilege (N.C.G.S. § 8-53.9 (2001)).

With respect to statutorily established privileges, we also find it notable that with other types of privileged communications, such as the clergyman privilege, the General Assembly has made these in essence absolute by not including any provision for a judge to "com-

pel disclosure if in his opinion disclosure is necessary to a proper administration of justice." N.C.G.S. § 8-53. *See* N.C.G.S. § 8-53.2 (2001) (no disclosure of information between clergymen and communicants); N.C.G.S. § 8-53.6 (2001) (no disclosure of information obtained by a therapist doing marital counseling in alimony or divorce actions). Significantly, our General Assembly has not seen fit to enact such statutory provisions for the attorney-client privilege, and we must look solely to the common law for its proper application. N.C.G.S. § 4-1 (2001).

With regard to case law, the State asserts that the rationale in *Cohen v. Jenkintown Cab Co.*, 238 Pa. Super. 456, 357 A.2d 689 (1976), supports the application of a balancing test in the case *sub judice*. In *Cohen*, the court concluded that the "interests of justice" required disclosure of a deceased client's communications with his attorney. *Id.* at 461-64, 357 A.2d at 692-93. The court balanced the necessity of revealing the confidential communications against the possibility of harm to the client's estate, reputation, or rights and interests. *Id.* at 464, 357 A.2d at 693. The rationale supporting the decision in *Cohen* was that the attorney-client privilege exists to aid in the "administration of justice," and when this goal is frustrated by its application, the trial court can compel disclosure. *Id.* at 464, 357 A.2d at 693-94.

In response to the State's argument, respondent asserts that the United States Supreme Court's decision in *Swidler*, 524 U.S. 399, 141 L. Ed. 2d 379, is virtually indistinguishable from the instant case. The Court in *Swidler* explicitly rejected the balancing test as applied to the attorney-client privilege in *Cohen*. *Id.* at 409, 141 L. Ed. 2d at 388. In *Swidler*, Vincent W. Foster, Jr. was the Deputy White House Counsel when the Office of Independent Counsel investigated whether various crimes were committed during the 1993 dismissal of several employees from the White House Travel Office. *Id.* at 401, 141 L. Ed. 2d at 383. In July 1993, Foster met with an attorney at the firm of Swidler & Berlin for legal representation in regard to possible investigations which might be conducted into the employee firings. *Id.* Nine days after Foster met with his attorney, he committed suicide. *Id.* at 402, 141 L. Ed. 2d at 383.

In 1995, a federal grand jury issued subpoenas in order to obtain the handwritten notes made by Foster's attorney during the July 1993 meeting. *Id.* The federal district court reviewed the handwritten notes *in camera* and concluded that they were protected from disclosure by the attorney-client privilege and the work-product privi-

lege. *Id.* The Court of Appeals for the District of Columbia Circuit reversed, concluding that an exception to the attorney-client privilege applied. *In re Sealed Case*, 124 F.3d 230 (D.C. Cir. 1997), *rev'd sub nom. Swidler & Berlin v. United States*, 524 U.S. 399, 141 L. Ed. 2d 379. The Court of Appeals applied a balancing test and "determined that the uncertainty introduced by its balancing test was insignificant in light of existing exceptions to the privilege." *Swidler*, 524 U.S. at 402-03, 141 L. Ed. 2d at 384. The United States Supreme Court reversed the Court of Appeals, refusing to permit disclosure of the confidential communications between Foster and his attorney. *Swidler*, 524 U.S. 399, 141 L. Ed. 2d 379.

The United States Supreme Court reasoned that when a client communicates with his attorney, he may not then be aware of the possibility that his statements might later become part of a civil or criminal matter. *Id.* at 409, 141 L. Ed. 2d at 387. The Court also recognized the dangers associated with invoking exceptions to the attorney-client privilege:

> Knowing that communications will remain confidential even after death encourages the client to communicate fully and frankly with counsel. While the fear of disclosure, and the consequent withholding of information from counsel, may be reduced if disclosure is limited to posthumous disclosure in a criminal context, it seems unreasonable to assume that it vanishes altogether. Clients may be concerned about reputation, civil liability, or possible harm to friends or family. Posthumous disclosure of such communications may be as feared as disclosure during the client's lifetime.

*Id.* at 407, 141 L. Ed. 2d at 386. Moreover, the Court expressly rejected the application of a balancing test to the attorney-client privilege when the client has died and the privileged information at issue is pursued to further a criminal investigation:

> Balancing *ex post* the importance of the information against client interests, even limited to criminal cases, introduces substantial uncertainty into the privilege's application.

*Swidler*, 524 U.S. at 409, 141 L. Ed. 2d at 387-88.

In addition, the Supreme Judicial Court of Massachusetts has also decided this issue, and it too rejected the holding in *Cohen. In re John Doe Grand Jury Investigation*, 408 Mass. 480, 485, 562 N.E.2d 69, 71-72 (1990). In *John Doe*, a grand jury was investigating the

involvement of Charles Stuart in two deaths. *Id.* at 481, 562 N.E.2d at 69. The day before his own death, Charles Stuart spent two hours in conference with his attorney. *Id.* After his death, the State sought disclosure of the communications which transpired during the conference. *Id.*

In *John Doe*, the court emphasized that an "extraordinarily high value must be placed on the right of every citizen to obtain the thoughtful advice of a fully informed attorney concerning legal matters." *Id.* at 485, 562 N.E.2d at 71. The court concluded that a rule allowing for disclosure of attorney-client communications, even after the death of the client, would deter the client from being candid with his attorney. *Id.* As a result, the ability of the attorney, as an advisor, could be impaired. *Id.* The court concluded that the potential for ineffective assistance was in direct opposition to the traditional right to counsel and a beneficial attorney-client relationship. *Id.* The court in *John Doe* strictly upheld the sanctity of the attorney-client privilege.

In the instant case, as in *Swidler*, the client sought legal advice from an attorney just days before he committed suicide. The facts as reflected in the record support the assumption that Mr. Willard was well aware of the criminal investigation and discussed the circumstances surrounding the death of Dr. Miller with respondent and with Mrs. Willard. It is apparent that Mr. Willard attempted to keep the information he communicated to respondent private. Unlike his co-workers, Mr. Willard refused to speak with law enforcement officials regarding the death of Dr. Miller, and most notably, he chose to commit suicide before he was questioned or otherwise pressured to reveal whether he was involved in the death of Dr. Miller.

In assessing the adoption of a balancing test, as proposed by the State, we are cognizant of both the principal justification for such tests and the concerns for its application. Balancing tests provide trial courts with the flexibility to respond to unique circumstances and unanticipated situations. Bright-line rules, on the other hand, limit future judicial discretion and provide trial courts, and litigants, with predictability and consistency. *See* James G. Wilson, *Surveying the Forms of Doctrine on the Bright Line-Balancing Test Continuum*, 27 Ariz. St. L.J. 773, 777 (1995). A strict balancing test involving the attorney-client privilege, in the context of the present case after the client's death, subjects the client's reasonable expectation of nondisclosure to a process without parameters or standards,

IN RE INVESTIGATION OF DEATH OF ERIC MILLER

[357 N.C. 316 (2003)]

with an end result no more predictable in any case than a public opinion poll, the weather over time, or any athletic contest. Such a test, regardless of how well intentioned and conducted it may be, or how exigent the circumstances, would likely have, in the immediate future and over time, a corrosive effect on the privilege's traditionally stable application and the corresponding expectations of clients. Moreover, the proposed factors to be "balanced" are not capable of precise discernment or application in this case, or any case, and seem to add little to an assessment of whether the privilege should be waived. *See Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 214, 367 S.E.2d 609, 617 (1988) (rejecting the use of a balancing test).

The practical consequences of a balancing test include the difficulty of demonstrating equality of treatment, the decline of judicial predictability, and the facilitation of judicial arbitrariness. *See* Antonin Scalia, *Essay: The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1182 (1989). These concerns are further well expressed as follows: "Simply stated, the balancing test (1) does not ensure, even in theory, that like cases will be treated alike, and (2) so muddies the areas of the law it comes to dominate that those governed by it are left without clear guidance about what behavior is permitted and what is not." Patrick M. McFadden, *The Balancing Test*, 29 B.C. L. Rev. 585, 642 (1988). In light of these considerations, it appears that the application of a balancing test exception, even under such conditions as proposed by the State in the instant case, would invite procedures and applications so lacking in standards, direction and scope that the privilege in practice would be lost to the exception.

The attorney-client privilege is unique among all privileged communications. In practice, communications between attorney and client can encompass *all* subjects which may be discussed in any other privileged relationship and indeed all subjects within the human experience. As such, it is the privilege most beneficial to the public, both in facilitating competent legal advice and ultimately in furthering the ends of justice. We therefore conclude that the balancing test as proposed by the State is not appropriate and should not be applied under the circumstances of the instant case.

[7] The next step in our inquiry is to further examine the evidence or facts revealed in the record and determine whether any other reason or basis for exception to the privilege exists which would warrant disclosure of the information respondent possesses.

**IN RE INVESTIGATION OF DEATH OF ERIC MILLER**

[357 N.C. 316 (2003)]

We recognize first in this regard that the primary goal of our adversarial system of justice is to ascertain the truth in any legal proceeding. This proposition has been well stated as follows:

> The pertinent general principle, responding to the deepest needs of society, is that society is entitled to every man's evidence. As the underlying aim of judicial inquiry is ascertainable truth, everything rationally related to ascertaining the truth is presumptively admissible. Limitations are properly placed upon the operation of this general principle only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.

*Elkins v. United States*, 364 U.S. 206, 234, 4 L. Ed. 2d 1669, 1695 (1960) (Frankfurter, J., dissenting). "As has been said, the chief function of our judicial machinery is to ascertain the truth." *Estes v. Texas*, 381 U.S. 532, 544, 14 L. Ed. 2d 543, 551 (1965). "The object of the law is to ascertain the truth, and to base its judgments and decrees thereon." *Jones v. Bobbitt*, 90 N.C. 391, 394 (1884). "The law seeks to ascertain the truth and, upon it alone, to adjudge the rights of the parties." *Starr v. Southern Cotton Oil*, 165 N.C. 587, 590, 81 S.E. 776, 777 (1914). More recently, this Court has stated:

> At trial the major concern is the "search for truth" as it is revealed through the presentation and development of all relevant facts. To insure that truth is ascertained and justice served, the judiciary must have the power to compel the disclosure of relevant facts, not otherwise privileged, within the framework of the rules of evidence.

*State v. Hardy*, 293 N.C. 105, 125, 235 S.E.2d 828, 840 (1977).

While the attorney-client privilege is an essential component in our system of justice, many ethical and moral dilemmas exist as a result of this limitation on finding the truth. For example, one critic of the privilege has opined:

> Confidentiality rules invite attorneys to withhold information that could prevent harm to third parties in the course of representing their clients. The rules promote a culture of winning at any cost short of dishonesty while avoiding consideration of others.

**IN RE INVESTIGATION OF DEATH OF ERIC MILLER**

[357 N.C. 316 (2003)]

Lloyd B. Snyder, *Is Attorney-Client Confidentiality Necessary?*, XV Geo. J. Legal Ethics 477, at 522. It is further well established that the attorney-client privilege is not absolute. When certain extraordinary circumstances are present, the need for disclosure of attorney-client communications will trump the confidential nature of the privilege. *See United States v. Zolin*, 491 U.S. 554, 105 L. Ed. 2d 469 (1989) (crime-fraud exception to attorney-client privilege). With these principles in mind, we turn to the resolution of the primary issue presented in this case.

[8] It is universally accepted and well founded in the law of this State that not all communications between an attorney and a client are privileged. *E.g., State v. Murvin*, 304 N.C. at 531, 284 S.E.2d at 294; *State v. Tate*, 294 N.C. at 192, 239 S.E.2d at 824; *Dobias v. White*, 240 N.C. 680, 684-85, 83 S.E.2d 785, 788 (1954). This Court has recognized a five-part test to determine whether the attorney-client privilege applies to a particular communication:

> "(1) the relation of attorney and client existed at the time the communication was made, (2) the communication was made in confidence, (3) the communication relates to a matter about which the attorney is being professionally consulted, (4) the communication was made in the course of giving or seeking legal advice for a proper purpose although litigation need not be contemplated and (5) the client has not waived the privilege."

*McIntosh*, 336 N.C. at 523-24, 444 S.E.2d at 442 (quoting *State v. Murvin*, 304 N.C. at 531, 284 S.E.2d at 294). If any one of these five elements is not present in any portion of an attorney-client communication, that portion of the communication is not privileged. For example, pursuant to the second prong of this test, if it appears that a communication was not regarded as confidential or that the communication was made for the purpose of being conveyed by the attorney to others, the communication is not privileged. *McIntosh*, 336 N.C. at 524, 444 S.E.2d at 442 (citing *Dobias v. White*, 240 N.C. at 684-85, 83 S.E.2d at 788). In addition, the fourth prong of this test makes it clear that the attorney-client privilege cannot serve as a shield for fraud or as a tool to aid in the commission of future criminal activities; if a communication is not " 'made in the course of seeking or giving legal advice for a proper purpose,' " it is not protected. *See State v. Jennings*, 333 N.C. 579, 611, 430 S.E.2d 188, 204 (quoting 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 62, at 302 (3d ed. 1988)), *cert. denied*, 510 U.S. 1028, 126 L. Ed. 2d 602 (1993).

**IN RE INVESTIGATION OF DEATH OF ERIC MILLER**

[357 N.C. 316 (2003)]

In the usual instance, it is impossible to determine whether a particular communication meets the elements of the test set forth in *McIntosh*, particularly the third and fourth prongs, without first knowing the substance of that communication. Thus, an *in camera* review of the content of an attorney-client communication may be necessary before a trial court is able to determine whether that communication is privileged:

> The burden is always on the party asserting the privilege to demonstrate each of its essential elements. This burden may not be met by "mere conclusory or ipse dixit assertions," or by a "blanket refusal to testify." Rather, sufficient evidence must be adduced, usually by means of an affidavit or affidavits, to establish the privilege with respect to each disputed item.

1 Scott N. Stone & Robert K. Taylor, *Testimonial Privileges* § 1.61, at 1-161 (2d ed. 1994) (citations omitted); *see also United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982) ("The burden is on the proponent of the attorney-client privilege to demonstrate its applicability."); *Miles v. Martin*, 147 N.C. App. 255, 259-60, 555 S.E.2d 361, 364 (2001); *Multimedia Publ'g of N.C., Inc. v. Henderson Cty.*, 136 N.C. App. 567, 576, 525 S.E.2d 786, 792, *disc. rev. denied*, 351 N.C. 474, 543 S.E.2d 492 (2000).

More than a century ago, this Court held that the responsibility of determining whether the attorney-client privilege applies belongs to the trial court, not to the attorney asserting the privilege. *Hughes v. Boone*, 102 N.C. 137, 160, 9 S.E. 286, 292 (1889). Thus, a trial court is not required to rely solely on an attorney's assertion that a particular communication falls within the scope of the attorney-client privilege. In cases where the party seeking the information has, in good faith, come forward with a nonfrivolous assertion that the privilege does not apply, the trial court may conduct an *in camera* inquiry of the substance of the communication. *See State v. Buckner*, 351 N.C. 401, 411-12, 527 S.E.2d 307, 314 (2000) (trial court must conduct *in camera* review when there is a dispute as to the scope of a defendant's waiver of the attorney-client privilege, such as would be the case when a defendant has asserted an ineffective assistance of counsel claim); *State v. Taylor*, 327 N.C. at 155, 393 S.E.2d at 807 (same); *see also Willis v. Duke Power Co.*, 291 N.C. 19, 36, 229 S.E.2d 191, 201 (1976) (trial court may require *in camera* inspection of documents to determine if they are work-product).

**IN RE INVESTIGATION OF DEATH OF ERIC MILLER**

[357 N.C. 316 (2003)]

We note that the United States Supreme Court has also placed its imprimatur on the need for *in camera* inspections in circumstances where application of the privilege is contested. *Zolin,* 491 U.S. 554, 105 L. Ed. 2d 469 (*in camera* review to determine whether the crime-fraud exception to attorney-client privilege applies); *United States v. Nixon,* 418 U.S. 683, 41 L. Ed. 2d 1039 (1974) (*in camera* review to determine whether communications are subject to the executive privilege). The necessity for an *in camera* review of attorney-client communications in some cases is also endorsed by the Restatement of the Law Governing Lawyers: "In cases of doubt whether the privilege has been established, the presiding officer may examine the contested communication *in camera.*" Restatement (Third) of the Law Governing Lawyers § 86 cmt. f (2000). However, we note, as the Supreme Court did in *Zolin,* that the "disclosure of allegedly privileged materials to the [trial] court for purposes of determining the merits of a claim of privilege does not have the legal effect of terminating the privilege." *Zolin,* 491 U.S. at 568, 105 L. Ed. 2d at 488. Thus, the material or communication asserted to be privileged retains its confidential nature notwithstanding an *in camera* review, at least through the review process.

We therefore conclude that, in the instant case, the trial court's decision to conduct an *in camera* review of the communications between respondent and Mr. Willard was procedurally correct. The trial court did not err in ordering respondent to provide the trial court with a sealed affidavit containing the communications which transpired between Mr. Willard and respondent, for the purpose of determining whether the attorney-client privilege applies to any portion of the communication. Upon such review on remand, the trial court's threshold inquiry is to determine whether the information communicated between respondent and Mr. Willard, or any portion thereof, is in fact privileged.

[9] Turning now more specifically to the five-part *McIntosh* test, we note that the unique facts of the instant case, as reflected in the record, raise concerns, particularly regarding the application of the third and fourth prongs of the *McIntosh* test. As to the third prong, the communications must relate to a matter about which the attorney is being professionally consulted, and considering also the first prong of the test in this regard, it is clear that only those communications which are between the attorney and the client and which are part of the client's actual purpose for the legal consultation are privileged. *See Murvin,* 304 N.C. at 531-32, 284 S.E.2d at 294-95. While commu-

IN RE INVESTIGATION OF DEATH OF ERIC MILLER

[357 N.C. 316 (2003)]

nications made by a client to an attorney which pertain to the culpability or interests of the client are privileged and ordinarily remain privileged after the client's death, communications between an attorney and a client that relate to or concern the interests, rights, activities, motives, liabilities, or plans of some third party, the disclosure of which would not tend to harm the client, do not logically fall within North Carolina's definition of attorney-client privileged information. With regard to the fourth prong of the *McIntosh* test, the communications must relate to communications between the attorney and the client for a proper purpose. While communications concerning the client's own criminal culpability and his defense is certainly privileged, it is difficult to fathom how any communications relating to a third party's criminal activity, concealment thereof or obstruction of justice could fall within such category, when disclosure thereof would not tend to harm the client. The concept of "proper purpose" relates not only to whether the communications involve the client's future illegal activity, obstruction of justice or activity directly or indirectly aiding a third party in some illegal activity, but it also relates only to communications that would properly benefit the client as opposed to a third party.

The author of one leading treatise on the law of evidence explained that the attorney-client privilege should be asserted only "by the person whose interest the particular rule of privilege is intended to safeguard." *McCormick on Evidence* § 92, at 368. This interpretation of the privilege is consistent with the privilege's underlying purpose:

> While once it was conceived that the privilege was set up to protect the lawyer's honor, we know that today it is agreed that the basic policy of the rule is that of encouraging clients to lay the facts fully before their counsel. They will be ·encouraged by a privilege which they themselves have the power to invoke. *To extend any benefit or advantage to someone as attorney, or as party to a suit, or to people generally, will be to suppress relevant evidence without promoting the purpose of the privilege.*

*Id.* at 369 (emphasis added). " 'There is a privilege of secrecy as to what passes between attorney and client, but it is the privilege of the client and he may waive it if he chooses. . . . *It is not the privilege of the court or any third party.*' " *Schaibly v. Vinton*, 338 Mich. 191, 196, 61 N.W.2d 122, 124 (1953) (quoting *Passmore v. Estate of Passmore*, 50 Mich. 626, 627, 16 N.W. 170, 171 (1883)) (emphasis added). Although an attorney may assert the privilege when neces-

sary to protect the interests of the client, the privilege belongs solely to the client. "The law of privileged communications between attorney and client is that the privilege is that of the client. *He alone is the one for whose protection the rule is enforced.*" *Ex parte Lipscomb*, 111 Tex. 409, 415, 239 S.W. 1101, 1103 (1922) (emphasis added); *see also Russell v. Second Nat'l Bank of Paterson*, 136 N.J.L. 270, 278, 55 A.2d 211, 217 (1947).

Our review of the North Carolina common law regarding the attorney-client privilege further supports our interpretation as to the extent of the third and fourth prongs of the *McIntosh* test and when they apply. In *State v. Murvin*, 304 N.C. 523, 284 S.E.2d 289, the defendant was suspected of breaking into a shipping company, stealing goods from its shop, and murdering the security guard. *Id.* at 524-25, 284 S.E.2d at 290-91. At the time these crimes occurred, Linda Sue Albertson was living with the defendant, and she acquired information implicating the defendant in the crimes. *Id.* at 525, 284 S.E.2d at 291. Approximately four years after these crimes were committed, Ms. Albertson executed an affidavit in the presence of her attorney in which she made statements implicating the defendant in the crimes. *Id.* at 530-31, 284 S.E.2d at 294. During the subsequent prosecution of the defendant, Ms. Albertson testified as to her knowledge of the defendant's culpability. *Id.* at 525, 530, 284 S.E.2d at 291, 294. On cross-examination, defense counsel questioned Ms. Albertson regarding statements contained in the affidavit which was previously executed in the presence of her attorney. *Id.* at 530, 284 S.E.2d at 294. The trial court sustained the State's objection on the basis that the affidavit "came within the scope of the attorney-client privilege." *Id.* The defendant was convicted, and he appealed to this Court. *Id.* at 526, 284 S.E.2d at 291-92.

In *Murvin*, this Court held that the attorney-client privilege did not apply to Ms. Albertson's affidavit. *Id.* at 532, 284 S.E.2d at 294-95. This Court's analysis included the following:

> The record discloses that Ms. Albertson was arrested on the evening of giving the affidavit to her attorney for receiving stolen goods. Ms. Albertson apparently was consulting with counsel with respect to that charge. When asked if the affidavit had anything to do with "what the law was trying to find you for," Ms. Albertson responded negatively.

*Id.* at 531-32, 284 S.E.2d at 295. Relying on the record, this Court determined that, at the time the affidavit was executed, Ms. Albertson

IN RE INVESTIGATION OF DEATH OF ERIC MILLER

[357 N.C. 316 (2003)]

had "employed the attorney to represent her in a criminal matter unrelated to the present case." *Id.* at 530, 284 S.E.2d at 294. This Court then reasoned that "the communication did not relate to a matter concerning which Ms. Albertson had employed her attorney or for which she was professionally consulting him." *Id.* at 531, 284 S.E.2d at 294. Therefore, this Court concluded that the subject matter of the affidavit was not attorney-client privileged information. *Id.* at 532, 284 S.E.2d at 295. We find it particularly noteworthy that the substance of the affidavit tended to incriminate a third party and that there was no suggestion in *Murvin* that Ms. Albertson, the communicating client, was at risk of incurring any liability or harm as a result of the statements in the affidavit.

Pursuant then to this analysis, we believe that communications between attorney and client regarding any criminal activity of a third party, which do not tend to harm the interests of the client, do not satisfy the third and fourth prongs of the *McIntosh* test, and such communications are therefore not privileged. Accordingly, we hold that when a trial court, after conducting an *in camera* review as described below, determines that some or all of the communications between a client and an attorney do not relate to a matter that affected the client at the time the statements were made, about which the attorney was professionally consulted within the parameters of the *McIntosh* test, such communications are not privileged and may be disclosed.

With regard to the instant case, in determining whether Mr. Willard's statements to respondent should be disclosed, the trial court should consider the circumstances surrounding Mr. Willard at the time he communicated with counsel. In applying the *McIntosh* factors, the trial court should be mindful that the statements were made by Mr. Willard when he presumably knew he was a suspect in a criminal investigation. In this context, it is conceivable that statements by Mr. Willard which implicated a third party may have also implicated him in a crime. If so, those statements, if then revealed, would have subjected him to criminal liability. Therefore, at the time Mr. Willard made the statements, anything he said relating his collaborative involvement with a third party in the death of Dr. Miller was covered by the attorney-client privilege.

In limiting the application of the privilege by holding that attorney-client communications which relate solely to a third party are not privileged, we note that this rationale would not apply in a situation where the person communicating with the attorney was

**IN RE INVESTIGATION OF DEATH OF ERIC MILLER**

[357 N.C. 316 (2003)]

acting as an agent of some third-party principal when the communication was made. *See State v. Van Landingham*, 283 N.C. at 602, 197 S.E.2d at 547. In that instance, the information would remain privileged because the third-party principal would actually be the client who is communicating with the attorney through the agent. Because the communication would relate to the third-party principal's interests, it would therefore be within the scope of matter about which the attorney was professionally consulted and thus would be privileged.

**[10]** We further conclude that in considering, by *in camera* review, whether communications asserted to be privileged should be disclosed, a trial court should additionally apply the maxim *cessante ratione legis, cessat ipsa lex*. When the underlying justification for the rule of law, or in this case the privilege, is not furthered by its continued application, the rule or privilege should cease to apply. "It is contrary to the spirit of the common law itself to apply a rule founded on a particular reason to a law when that reason utterly fails." *Patton v. United States*, 281 U.S. 276, 306, 74 L. Ed. 854, 867 (1930). The application of this maxim was further well stated by the United States Supreme Court as follows:

> If the reasons on which a law rests are overborne by opposing reasons, which in the progress of society gain a controlling force, the old law, though still good as an abstract principle, and good in its application to some circumstances, must cease to apply as a controlling principle to the new circumstances.

*Funk v. United States*, 290 U.S. 371, 385, 78 L. Ed. 369, 377 (1933); *see also Williams v. Chapman*, 118 N.C. 943, 945, 24 S.E. 810, 811 (1896); *Locke v. Alexander*, 8 N.C. 412, 417 (1821). In this regard, and specifically with respect to the attorney-client privilege, the United States Supreme Court has stated that " 'since the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose.' " *Zolin*, 491 U.S. at 562, 105 L. Ed. 2d at 484 (quoting *Fisher v. United States*, 425 U.S. 391, 403, 48 L. Ed. 2d 39, 51 (1976)). Thus, we further consider at this point in our analysis whether nondisclosure in the present case furthers the purpose for which the privilege exists.

When a client retains an attorney for legal advice in regard to an ongoing criminal investigation, the client's desire to keep the communication confidential is premised upon three possible consequences in the event of disclosure: (1) that disclosure might subject

the client to criminal liability; (2) that disclosure might subject the client, or the client's estate, to civil liability; and (3) that disclosure might harm the client's loved ones or his reputation. *See Swidler,* 524 U.S. at 407, 141 L. Ed. 2d at 386. Therefore, in determining whether the reasons for the privilege still exist after the client is deceased, the trial court should consider the *Swidler* factors. In the instant case, the trial court should consider whether these possible consequences would apply to, or would have any negative or harmful effect on, Mr. Willard's rights and interests if the State was permitted to obtain the information communicated between Mr. Willard and respondent. In the event the trial court, upon *in camera* review, should conclude that any of these consequences still apply to any portion of the communications, they should remain undisclosed. If, on the other hand, the trial court should determine that the communications asserted to be privileged would have no negative impact on Mr. Willard's interests, the purpose for the privilege no longer exists. When application of the privilege will no longer safeguard the client's interests, no reason exists in support of perpetual nondisclosure.

[11] We acknowledge that, while some risk of withholding information might remain if an attorney were permitted, even under this very narrow premise, to disclose privileged information after a client has died, the instant case presents unique circumstances in which there may be little or no risk of harm to the client. It is indeed a rare case where the full application of the above rationale would apply; therefore, trial courts should carefully analyze each individual factual situation on a case-by-case basis when determining whether to permit disclosure of information asserted to be privileged. In this regard, we emphasize that in approving *in camera* review pursuant to the narrow principles herein set forth, we are in no way sanctioning or suggesting any general application of special proceedings or grand jury investigations by prosecutors in the nature of fishing expeditions or otherwise which would tend to diminish in any way the great value to the public of the attorney-client privilege by its proper application through the judicial process.

In summary then, we hold that when a client is deceased, upon a nonfrivolous assertion that the privilege does not apply, with a proper, good-faith showing by the party seeking disclosure of communications, the trial court may conduct an *in camera* review of the substance of the communications. To the extent any portion of the communications between the attorney and the deceased client relate solely to a third party, such communications are not within the

**IN RE INVESTIGATION OF DEATH OF ERIC MILLER**

[357 N.C. 316 (2003)]

purview of the attorney-client privilege. If the trial court finds that some or all of the communications are outside the scope of the attorney-client privilege, the trial court may compel the attorney to provide the substance of the communications to the State for its use in the criminal investigation, consistent with the procedural formalities set forth below. To the extent the communications relate to a third party but also affect the client's own rights or interests and thus remain privileged, such communications may be revealed only upon a clear and convincing showing that their disclosure does not expose the client's estate to civil liability and that such disclosure would not likely result in additional harm to loved ones or reputation. We do not reach the issue of whether any such information so provided by any attorney would be admissible in any future criminal prosecution. In the event a subsequent criminal prosecution ensues, the trial court would apply the rules of evidence to this information in the event it is tendered in evidence and determine then whether it is admissible against a defendant.

Upon *in camera* review, in the event the trial court concludes that any portion of the communications made between the client and the attorney is either not subject to the attorney-client privilege, or though privileged no longer serves the purpose of the privilege and may be disclosed, the attorney's affidavit and the information contained therein must nevertheless remain sealed and preserved in the records of the trial court for appellate review in the event of an immediate appeal. The trial court's determination of the applicability of the privilege or disclosure affects a substantial right and is therefore immediately appealable. *Cf. Sharpe v. Worland,* 351 N.C. 159, 166, 522 S.E.2d 577, 581 (1999) (a ruling on an interlocutory discovery order affects a substantial right when the assertion of a statutory privilege directly relates to the matter to be disclosed under the order). "It is elementary that *in camera* inspection . . . is always a procedure calling for scrupulous protection against any release or publication of [privileged] material." *Nixon,* 418 U.S. at 714, 41 L. Ed. 2d at 1067. Consequently, the trial court should carefully guard the contents of any materials it receives from the *in camera* review, even if it concludes that the information is not protected by the attorney-client privilege, so long as the party objecting to disclosure gives notice of immediate appeal.

In the instant case, in addition to his principal argument, respondent has also raised the issue of the confidential marital-communications privilege. Respondent contends that the trial court erred

IN RE INVESTIGATION OF DEATH OF ERIC MILLER

[357 N.C. 316 (2003)]

when it considered Mrs. Willard's affidavit as a factor in issuing its 7 March 2002 order. Specifically, respondent asserts that, because the affidavit contains confidential information which was communicated between Mr. Willard and Mrs. Willard during their marriage, the material contained therein is privileged. In her affidavit, Mrs. Willard stated that, after his meeting with respondent, Mr. Willard told Mrs. Willard that respondent said he "could be charged with the attempted murder of Eric D. Miller."

In this regard, we note that in addition to the affidavit of Mrs. Willard, the State also submitted the affidavit of Lieutenant William C. Morgan, supervisor of the Major Crimes Task Force of the Raleigh Police Department, in which he states that, during his interviews with Mrs. Willard, he learned that Mr. Willard told Mrs. Willard that respondent said Mr. Willard could be charged with the attempted murder of Dr. Miller. The validity and admissibility of Lieutenant Morgan's affidavit in this special proceeding is not presently contested or at issue. In light of Lieutenant Morgan's affidavit, any possible error by the trial court in considering Mrs. Willard's affidavit is harmless.

In any event, we have resolved the principal issue in this appeal without consideration of Mrs. Willard's affidavit. Accordingly, the arguments relating to the confidential marital communications privilege are moot and need not be addressed. *See Campbell v. Pitt Cty. Mem'l Hosp., Inc.*, 321 N.C. 260, 266, 362 S.E.2d 273, 276 (1987); *Bellefonte Underwriters Ins. Co. v. Alfa Aviation, Inc.*, 310 N.C. 471, 473, 312 S.E.2d 426, 427-28 (1984); *Superior Foods, Inc. v. Harris-Teeter Super Markets, Inc.*, 288 N.C. 213, 227, 217 S.E.2d 566, 576 (1975). An issue is moot "when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy." *Roberts v. Madison Cty. Realtors Ass'n*, 344 N.C. 394, 399, 474 S.E.2d 783, 787 (1996). " '[C]ourts will not entertain or proceed with a cause merely to determine abstract propositions of law.' " *Id.* (quoting *In re Peoples*, 296 N.C. 109, 147, 250 S.E.2d 890, 912 (1978), *cert. denied*, 442 U.S. 929, 61 L. Ed. 2d 297 (1979)); *see also Benvenue Parent-Teacher Ass'n v. Nash Cty. Bd. of Educ.*, 275 N.C. 675, 679, 170 S.E.2d 473, 476 (1969); *Person v. Board of State Tax Comm'rs*, 184 N.C. 499, 505, 115 S.E. 336, 341 (1922); *Ginsberg v. Leach*, 111 N.C. 15, 16, 15 S.E. 882, 883 (1892). We note that, if a subsequent action is commenced, it will be for the trial court to determine whether any evidence, including the substance of Mrs. Willard's affidavit, is admissible at trial.

Based upon the foregoing, the decision of the trial court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.