Haddock v. Volunteers of Am., Inc., 2021 NCBC 49.

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS 8065

TONYA A. HADDOCK and
CADENCE DEVELOPMENT, LLC,

Plaintiffs,

v.

VOLUNTEERS OF AMERICA, INC.;
VOLUNTEERS OF AMERICA
NATIONAL SERVICES; and
SUSSEX VOA AFFORDABLE
HOUSING, LLC,

Defendants.

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO STRIKE
AND DEFENDANTS' PARTIAL
MOTION TO DISMISS**

1. **THIS MATTER** is before the Court on the 11 March 2021 filing of Defendants' Motion to Strike (the "Motion to Strike") brought pursuant to Rule 12(f) the North Carolina Rules of Civil Procedure (the "Rule(s)"), (Defs.' Mot. Strike, ECF No. 55 ["Mot. Strike"]), and a separate filing on the same date of Defendants' Partial Motion to Dismiss brought pursuant to Rule 12(b)(6) (the "Motion to Dismiss" and with the Motion to Strike collectively referred to as the "Motions"), (ECF No. 58).

2. For the reasons set forth herein, the Court **DENIES** the Motion to Strike and **GRANTS** in part and **DENIES** in part the Motion to Dismiss.

> *Ellinger & Carr, PLLC, by Steven Carr, Jeffrey Ellinger, and Susan Yelton Ellinger, for Plaintiffs Tonya A. Haddock and Cadence Development, LLC.*

> *The Banks Law Firm, P.A., by Sherrod Banks, Theodore Curtis Edwards, and Jesse H. Rigsby, for Defendants Volunteers of America, Inc., Volunteers of America National Services, and Sussex VOA Affordable Housing, LLC.*

Robinson, Judge.

## I. INTRODUCTION

3. These Motions follow this Court's 22 January 2021 entry of the Order and Opinion on Defendants' Motion to Strike and Motion to Dismiss (the "Initial Order and Opinion"). *Haddock v. Volunteers of Am., Inc.*, 2021 NCBC LEXIS 8, at *1 (N.C. Super. Ct. Jan. 22, 2021). In the Initial Order and Opinion, the Court dismissed five claims asserted by Plaintiffs Tonya A. Haddock ("Haddock") and Cadence Development, LLC ("Cadence Development") in their Verified Complaint and Demand for Jury Trial, including Plaintiffs' claims for Breach of Duty to Partner and Unfair and Deceptive Trade Practices. *Haddock*, 2021 NCBC LEXIS 8, at *20.

4. Pursuant to Rule 15, on 9 February 2021, Plaintiffs amended their first complaint and filed the Amended Complaint and Demand for Jury Trial (the "Amended Complaint"). (Am. Compl. & Demand Jury Trial, ECF No. 52 ["Am. Compl."].) Now Defendants request that the Court strike certain allegations in the Amended Complaint pursuant to Rule 12(f), dismiss certain claims pursuant to Rule 12(b)(6), deny a request for relief, and dismiss Defendant Sussex VOA Affordable Housing, LLC ("Sussex VOA") from this action.

## II. FACTUAL BACKGROUND

5. The Court does not make findings of fact on the Motions brought pursuant to Rule 12, but instead only recites those facts included in the Amended Complaint relevant to the Court's determination of the Motions.

6.  Haddock is a developer of affordable housing projects, which are financed in part by low-income housing tax credits under Section 42 of the Internal Revenue Code. (Am. Compl. ¶ 5.)

7.  Cadence Development is a North Carolina limited liability company. (Am. Compl. ¶ 5.) Haddock is the manager of Cadence Development's managing member. (Am. Compl. ¶ 5.)

8.  Defendants Volunteers of America, Inc. ("VOA") and Volunteers of America National Services ("VOANS" and with VOA collectively referred to as "VOA Defendants") are nonprofit corporations. (Am. Compl. ¶ 6.) VOANS is a "wholly controlled" subsidiary of VOA. (Am. Compl. ¶ 26.)

9.  Beginning in 2018, Haddock and Cadence Development started the development of an affordable housing project in Raleigh, North Carolina known as "The Sussex." (Am. Compl. ¶ 7.) Haddock and Cadence Development obtained options to purchase four parcels of real property for the development of The Sussex (the "Purchase Options"). (Am. Compl. ¶ 7.)

10.  On 21 September 2018, representatives of VOA, John Kirkland ("Kirkland") and Mary Phaneuf ("Phaneuf"), emailed Haddock in regards to The Sussex. (Am. Compl. ¶ 8.) Kirkland and Phaneuf informed Haddock that they became aware that Haddock was "looking for a non-profit partner" for The Sussex and Kirkland intended to discuss the project opportunity with VOA's Development Review Committee. (Am. Compl. ¶ 8.) On 28 September 2018, Kirkland informed Haddock that VOA had approval "to partner" with Haddock to develop The Sussex. (Am. Compl. ¶¶ 9–10.)

11. On 1 October 2018, Haddock assigned the Purchase Options for two of the parcels to VOANS. (Am. Compl. ¶ 40.) That same day, Haddock filed an initial application for tax credits to be allocated to an entity to be formed on a later date for the development of The Sussex. (Am. Compl. ¶ 14.)

12. On 14 October 2018, Kirkland represented to Haddock by email that "[w]e thought it best to create a partnership agreement as soon as we hear about the credits, the entities are set up, and we get Debbie McKenney signed up do [sic] create the agreement." (Am. Compl. ¶ 37.)

13. On 16 October 2018, VOA and Haddock entered into an Independent Contractor Agreement (the "Agreement"). (Am. Compl. Ex. 1 [the "Agreement"].) Section 9 of the Agreement provides in part that "[t]he relationship of [Haddock] to VOA is that of an independent contractor, and nothing in this Agreement shall be construed as creating any other relationship." (Agreement § 9.)

14. The Agreement sets a period for performance commencing on 1 October 2018 and ending on 31 January 2019.[1] (Agreement § 2.) By the terms of the Agreement, following 31 January 2019, the Agreement was to automatically extend for "successive sixty (60) day periods," unless (1) a party notified the other party of its desire not to extend the Agreement in writing; (2) VOA received or accepted

---

[1] The Agreement actually sets a date of 31 January 2018 for the expiration of the term of the Agreement. (Agreement § 2.) However, it is clear that the parties agree this is a typographical error and the end date in Section 2 of the Agreement is intended to be on 31 January 2019. (*See* Am. Compl. ¶ 39; Br. Supp. Mot. Dismiss 7.) This is further supported by Attachment B to the Agreement, which provides that VOA agreed to "periodically compensate" Haddock "on a monthly basis commencing October 1, 2018 through January 31, 2019." (Agreement Attach. B.)

Haddock's work as completed; or (3) the Agreement was terminated under its terms. (Agreement § 2.)

15. Section 4 of the Agreement provides that "[a]ny material change to the Work or the terms of this Agreement must be set forth in writing signed by the parties." (Agreement § 4.) This requirement is again emphasized in Section 15, which provides that the "Agreement may only be modified in writing, signed by the parties at the time of such modification." (Agreement § 15.)

16. Pursuant to the Agreement, Haddock was to be compensated with monthly draws of $10,000. (Agreement Attach. B.) VOA also agreed to pay Haddock "monthly draws against the Developer Fee share in the amount of 15% and 15% of the annual cash flow, or some mutually-agreed-upon compensation structure." (Agreement Attachs. A, B.)

17. Attachment A to the Agreement describes Haddock as "a local partner" and "a local developer partner." (Agreement Attach. A.) Attachment A also provides that "[b]oth parties agree that, upon realization and award of LIHTC bond financing . . . [the] parties shall enter into a future binding agreement that specifies partnership scope and compensation following the LIHTC award."[2] (Agreement Attach. A.)

18. On 30 and 31 October 2018, multiple VOA representatives, including Phaneuf and Kirkland, sent emails to an outsider non-party indicating that they needed assistance "in negotiating and drafting a co-developer agreement" with

---

[2] "LIHTC" as used in the Agreement means " 'low income housing tax credits' under Section 42 of the Internal Revenue Code." (Am. Compl. ¶ 32.)

Haddock to document VOA and Haddock's "agreement/partnership." (Am. Compl. ¶ 42 (emphasis omitted).)

19. Less than one month after entering into the Agreement, Haddock performed or commenced performance of all services she was to provide pursuant to the terms of the Agreement. (Am. Compl. ¶ 43.)

20. At a 2 November 2018 VOANS board meeting, minutes were recorded stating that "VOANS will be partnering with Tonya Haddock on this project." (Am. Compl. ¶ 18.) Plaintiffs allege that throughout 2018 and 2019, Kirkland and other VOA representatives made references to a "development partnership" with Haddock and described Haddock as "our partner" and "development partner." (Am. Compl. ¶ 17 (emphasis omitted).)

21. Notwithstanding the Agreement's expiration on 31 January 2019, VOA and Haddock agreed that she should continue to perform developer services for The Sussex and submit invoices to VOA for her services. (Am. Compl. ¶ 49.)

22. On 30 May 2019, Kirkland asked VOA representatives to provide Phaneuf and Haddock with a revised agreement between Haddock and VOA. (Am. Compl. ¶¶ 50, 53; *see also* Am. Compl. Ex. 2.) However, VOA never provided Haddock with a final revised agreement at any time after 30 May 2019, despite Haddock's multiple inquiries into the status of a revised agreement to Kirkland and Kimberly King ("King"), VOA's Senior Vice President of Housing Development. (Am. Compl. ¶¶ 54–55.)

23.     Sometime during June 2019, King, on behalf of VOA, informed Haddock in a telephone conversation that "Haddock could not participate as a partner with VOA in the development of the Sussex and could not receive cash flows from the project." (Am. Compl. ¶ 58.)   Haddock and King proceeded to negotiate an agreement for Haddock's payment and involvement with The Sussex.  (*See* Am. Compl. ¶¶ 58–60, 64–65.)  Specifically, Haddock requested compensation at 35% of the developer fee. (Am. Compl. ¶ 58.)

24.     On 31 July 2019, Haddock's lawyer sent a letter to VOA that expressed concerns regarding the negotiations of a revised agreement.  (Am. Compl. ¶ 66; *see also* Am. Compl. Ex. 7.)  Haddock's lawyer represented that Haddock was not in a position to renegotiate her fee for The Sussex and Haddock "was given multiple assurances throughout the performance of her duties that a finalized contract reflecting her original terms of 35% of the developer fee was forthcoming."  (Am. Compl. Ex. 7.)

25.     Haddock continued to work on The Sussex through 13 August 2019.  (Am. Compl. ¶ 68.)  Plaintiffs allege that instead of negotiating in good faith with Haddock, VOA Defendants suddenly terminated their relationship with her on 15 August 2019. (Am. Compl. ¶¶ 20, 77.)  At no time before that date did Defendants communicate to Haddock that Defendants were disappointed in or disapproved of any of her work for The Sussex.  (Am. Compl. ¶ 19.)

26.     On 13 December 2019, VOA formed Sussex VOA (collectively referred to herein with VOA Defendants as "Defendants") as a North Carolina limited liability

company. (Am. Compl. ¶¶ 6, 27, 78.) VOA Defendants are the only members and managers of Sussex VOA. (Am. Compl. ¶ 79.) VOANS is the managing member of Sussex VOA. (Am. Compl. ¶ 27.)

27. On 18 December 2019, VOA acquired the real property for The Sussex project by exercising the assigned Purchase Options and granted the deeds to the real property to Sussex VOA. (Am. Compl. ¶ 80.)

## III.  PROCEDURAL BACKGROUND

28. The Court sets forth here only those portions of the procedural history relevant to its determination of the Motions.

29. Plaintiffs initiated this action on 22 July 2020. (*See* ECF No. 3.) After the Court's entry of the Initial Order and Opinion, on 9 February 2021, Plaintiffs filed the Amended Complaint.

30. On 11 March 2021, Defendants filed the Motion to Strike and Defendants' Brief in Support of Motion to Strike. (Defs.' Br. Supp. Mot. Strike, ECF No. 56 ["Br. Supp. Mot. Strike"]), and separately filed the Motion to Dismiss and Defendants' Brief in Support of Partial Motion to Dismiss, (Defs.' Br. Supp. Partial Mot. Dismiss, ECF No. 59 ["Br. Supp. Mot. Dismiss"]).[3]

31. On 31 March 2021, Plaintiffs filed Plaintiffs' Brief Opposing Defendants' Motion to Strike Paragraphs 11 and 12 in Plaintiffs' Amended Complaint, (Pls.' Br.

---

[3] The Court notes that before the filing of the Motions, Plaintiffs filed the Motion for Rule 11 Sanctions and Rule 60 Relief, (ECF No. 53), and shortly after the filing of the Motions, Defendants filed Defendants' Motion to Strike Plaintiffs' Rule 11/60 Motions and Brief, (ECF No. 60). The Court intends to enter a separate order or orders on those motions at a later date.

Opposing Defs.' Mot. Strike Paragraphs 11 & 12 Pls.' Am. Compl., ECF No. 66 ["Resp. Mot. Strike"]), and Plaintiffs' Brief in Response to Defendants' Partial Motion to Dismiss, (Pls.' Br. Resp. Defs.' Partial Mot. Dismiss, ECF No. 67 ["Resp. Mot. Dismiss"]).

32. On 12 April 2021, Defendants filed their replies to the Motion to Strike, (ECF No. 72), and the Motion to Dismiss, (ECF No. 73).

33. The Motions are ripe for resolution.[4]

## IV. MOTION TO STRIKE

34. Defendants seek an order striking two paragraphs of the Amended Complaint. Defendants specifically contend that paragraphs 11 and 12 of the Amended Complaint should be stricken on the basis that the two paragraphs in question "plead the contents of attorney-client privileged email communications that were inadvertently produced to Plaintiffs in discovery" by Defendants. (Mot. Strike 1.)

35. Pursuant to Rule 12(f), a trial court "may order stricken from any pleading any insufficient defense or any redundant, irrelevant, immaterial, impertinent, or scandalous matter." N.C.G.S. § 1A-1, Rule 12(f). Whether to grant or deny a motion to strike brought pursuant to Rule 12(f) is within the trial court's sound discretion. *Reese v. City of Charlotte*, 196 N.C. App. 557, 567 (2009).

36. "Rule 12(f) motions are viewed with disfavor and are infrequently granted." *Daily v. Mann Media, Inc.*, 95 N.C. App. 746, 748–49 (1989) (internal quotation marks

---

[4] The Court, as permitted by North Carolina Business Court Rule 7.4, decides the Motions without a hearing.

and citation omitted). "Matter should not be stricken unless it has no possible bearing upon the litigation. If there is any question as to whether an issue may arise, the motion should be denied." *Shellhorn v. Brad Ragan, Inc.*, 38 N.C. App. 310, 316 (1978).

37. While tethered to Rule 12(f), the Motion to Strike is based on the contention that Defendants inadvertently disclosed documents constituting privileged and confidential attorney-client communications, in the form of a 3 October 2018 internal email produced to Plaintiffs in discovery, and that the allegations contained in paragraphs 11 and 12 of the Amended Complaint recount statements from those privileged communications. (Br. Supp. Mot. Strike 2–3.)

38. It is Plaintiffs' position that the referenced communications in paragraphs 11 and 12 of the Amended Complaint "were never intended to be confidential attorney-client communications" or if the communications are privileged, any such privilege was waived by Defendants. (Resp. Mot. Strike 6.)

39. A communication is protected by attorney-client privilege if:

> (1) the relation of attorney and client existed at the time the communication was made, (2) the communication was made in confidence, (3) the communication relates to a matter about which the attorney is being professionally consulted, (4) the communication was made in the course of giving or seeking legal advice for a proper purpose although litigation need not be contemplated and (5) the client has not waived the privilege.

*In re Investigation of the Death of Miller*, 357 N.C. 316, 335 (2003). The party asserting the attorney-client privilege has the burden of establishing each element. *Id.* at 336. "If any one of these five elements is not present in any portion of an

attorney-client communication, that portion of the communication is not privileged." *Id.* at 335.

40. "The attorney-client privilege can be waived by either intentional disclosure or inadvertent disclosure. In either case, a finding of waiver depends on the particular circumstances surrounding the disclosure." *Blythe v. Bell*, 2012 NCBC LEXIS 44, at *21 (N.C. Super. Ct. July 26, 2012) (citation omitted).

41. As noted by this Court in *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2019 NCBC LEXIS 54, at *27 (N.C. Super. Ct. Aug. 16, 2019), *aff'd per curiam*, 2021-NCSC-70:

> Courts balance the following factors to determine whether inadvertent production of privileged materials waives the attorney-client privilege: "(1) the reasonableness of the precautions taken to prevent inadvertent disclosure; (2) the number of inadvertent disclosures; (3) the extent of the disclosures; (4) any delay in measures taken to rectify the disclosures; and (5) overriding interests in justice." *Morris v. Scenera Research, LLC*, 2011 NCBC LEXIS 34, at *28 (N.C. Super. Ct. Aug. 26, 2011) (citing *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 259 (D. Md. 2008)). "The reasonableness of the privilege holder in protecting and asserting the privilege is paramount to overcoming the consequences of an inadvertent waiver." *Id.* (quoting *Martin v. State Farm Mut. Auto. Ins. Co.*, No. 3:10-CV-0144, 2011 U.S. Dist. LEXIS 36058, at *13 (S.D. W. Va. Apr. 1, 2011)).

42. The Motion to Strike fails to demonstrate that Defendants took reasonable steps to avoid inadvertent production of privileged materials. This is a key factor to be considered by the Court in determining whether to find that the waiver was inadvertent. The Motion to Strike and Defendants' briefing on the Motion to Strike are all silent on what steps Defendants took, in reviewing documents for the potential

production of attorney-client privileged communications or the steps Defendants took to prevent the disclosure of privileged communications to avoid waiving the privilege.

43. In the absence of such evidence, the Court finds that the Defendants failed to carry their burden to establish that Defendants took reasonable precautions to prevent inadvertent disclosure of the disputed privileged materials in the Amended Complaint, including the email in question in its document production. *See In re Investigation of the Death of Miller*, 357 N.C. at 336 (providing that the party asserting privilege may not meet its burden by conclusory assertions, but "sufficient evidence must be adduced" to establish privilege).

44. Defendants rely on a proposed consent protective order, agreed to by the parties, in their argument that the privilege was not waived as to the email communications contained in paragraphs 11 and 12 in the Amended Complaint. (Br. Supp. Mot. Strike 8–9.) The proposed consent protective order provides in part that the "[i]nadvertent disclosure or production of Discovery Materials that are subject to the attorney client privilege, the work-product doctrine, the joint-defense or common-interest privilege, or any other privilege or immunity from discovery shall not constitute a waiver of, or an estoppel as to any claim of, such privilege, immunity, or protection." (ECF No. 46.) However, when such a provision "does not address what constitutes inadvertent disclosure [and] what precautionary measures are required" the provision may be insufficient to protect the party from waiver of privileged communications. *Window World of Baton Rouge*, 2019 NCBC LEXIS 54, at \*30. As concluded in *Window World*, the Court concludes that notwithstanding this provision

of the proposed protective order, waiver of privilege may be found in this instance where Defendants make no representations and provide the Court with no evidence regarding whether their review for privileged materials was reasonable. *Id.* at \*29–31.

45. As a result of this determination, there is no proper basis to strike the allegations contained in paragraphs 11 and 12 of the Amended Complaint. Therefore, the Court DENIES the Motion to Strike.

## V. MOTION TO DISMISS

46. Defendants move to dismiss Plaintiffs' claims for (1) breach of partnership agreement and breach of fiduciary duty as a partner; (2) negligence; (3) constructive fraud; and (4) unfair and deceptive trade practices. Defendants further request that VOA Sussex be dismissed from this action and the Court deny Plaintiffs' request for a constructive trust.

### A. **Legal Standard**

47. In ruling on a motion to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, the Court reviews the allegations in the Amended Complaint in the light most favorable to Plaintiffs. *See Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017). The Court's inquiry is "whether, as a matter of law, the allegations of the complaint . . . are sufficient to state a claim upon which relief may be granted under some legal theory[.]" *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670 (1987). The Court accepts all well-pleaded factual allegations in the relevant pleading as true. *See Krawiec v. Manly*, 370 N.C. 602, 606 (2018). The

Court is therefore not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274 (2005) (citation omitted).

48. Furthermore, the Court "can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Moch v. A.M. Pappas & Assocs., LLC.*, 251 N.C. App. 198, 206 (2016) (citation omitted). The Court may consider these attached or incorporated documents without converting the Rule 12(b)(6) motion into a motion for summary judgment. *Id.* (citation omitted). Moreover, the Court "may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60 (2001) (citation omitted).[5]

49. Our Supreme Court has noted that "[i]t is well-established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.' " *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (quoting *Wood v. Guilford Cty.*, 355 N.C. 161, 166 (2002)). This

---

[5] In their response to the Motion to Dismiss, Plaintiffs make reference to matters outside the Amended Complaint and its attachments. The Court declines to consider information outside the Amended Complaint and its attachments or otherwise convert the Motion to Dismiss into one for summary judgment pursuant to Rule 56. *Moch*, 251 N.C. App. at 206 (providing that consideration of matters outside of the complaint and its attachments would result in converting a Rule 12(b)(6) motion into one for summary judgment).

standard of review for Rule 12(b)(6) is the standard our Supreme Court "uses routinely . . . in assessing the sufficiency of complaints in the context of complex commercial litigation." *Id.* at 615 n.7 (citations omitted).

**B.     Analysis**

50.     Defendants primarily argue that because the parties did not enter into a partnership agreement, or otherwise form a partnership under North Carolina law, all claims predicated on the existence of a partnership (constituting three of the four claims subject of this Motion to Dismiss) must fail.  (Br. Supp. Mot. Dismiss 1.)  The Court, at least in part, agrees and therefore GRANTS in part and DENIES in part the Motion to Dismiss.

**1.     Breach of Partnership Agreement and Breach of Fiduciary Duty as a Partner**

51.     Plaintiffs label their first cause of action as "Breach of Partnership Agreement and Breach of Fiduciary Duty as a Partner." (Am. Compl. 28.)  The Court separately addresses Plaintiffs' claim for "breach of partnership agreement" and "breach of fiduciary duty as a partner."

52.     While Plaintiffs label their first claim in part as a claim for breach of partnership agreement, the Court interprets the claim effectively to be a claim for breach of the Agreement. *See Chesson v. Rives*, 2013 NCBC LEXIS 46, at \*11 (N.C. Super. Ct. Oct. 28, 2013) ("A partnership agreement is a contract between the partners.").  In other words, the question of whether there was a partnership formed by Plaintiffs and Defendants is not determinative of Plaintiffs' breach of contract

claim. The Court focuses its inquiry on whether Plaintiffs adequately allege breach of the Agreement for the purposes of Rule 12(b)(6).

53. To state a breach of contract claim, a plaintiff need only allege "(1) [the] existence of a valid contract and (2) [a] breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26 (2000). As stated numerous times by this Court, "stating a claim for breach of contract is a relatively low bar." *Vanguard Pai Lung, LLC v. Moody*, 2019 NCBC LEXIS 39, at *11 (N.C. Super. Ct. June 19, 2019).

54. The Court interprets Plaintiffs' breach of contract claim to be based on VOA Defendants' "failing and refusing to account for and to pay the amounts due to Ms. Haddock under the Agreement." (Am. Compl. ¶ 101.) Plaintiffs allege, and the terms of the Agreement establish, that "Defendants agreed . . . to compensate [Haddock] with 15% of the developer fee earned by the parties for the development of The Sussex, and 15% of the project cash flows, as expressly stated in the Agreement." (Am. Compl. ¶ 22; *see also* Agreement Attach. B.) Plaintiffs further allege that Defendants breached this Agreement. (Am. Compl. ¶ 23.)

55. To the extent Plaintiffs' breach of contract claim is based on non-payment by Defendants to Haddock pursuant to the terms of the Agreement, the Court concludes that Plaintiffs have sufficiently stated a breach of contract claim. Therefore, the Motion to Dismiss should be DENIED as to the request that the Court

dismiss Plaintiffs' first claim for relief to the extent the claim is based on Defendants' non-payment to Haddock pursuant to the terms of the Agreement.

56. Unlike Plaintiffs' breach of contract claim, Plaintiffs' claim for breach of fiduciary duty, alleged as part of the first claim for relief, is entirely premised on Plaintiffs' contention that the parties established a partnership.

57. Plaintiffs allege that "Defendants and Ms. Haddock agreed to carry on as co-owners of a business for profit, The Sussex." (Am. Compl. ¶ 95.) In support of their breach of fiduciary duty to partner claim, Plaintiffs contend that "the words of the Agreement also make it clear that *their agreement was a partnership agreement*[,]" and it so follows that Defendants owe Plaintiffs a fiduciary duty. (Resp. Mot. Dismiss 9 (emphasis in original).)

58. Plaintiffs seemingly make an additional argument that in considering the parties' conduct, as alleged in the Amended Complaint, the Court could infer the existence of a partnership between them. (Resp. Mot. Dismiss 16.) Plaintiffs cite to *Wilder v. Hobson*, 101 N.C. App. 199, 202 (1990), for the proposition that the "[e]xistence of a partnership does not require an express agreement and the parties' intent to formulate a partnership can be inferred by the conduct of the parties by examining all of the circumstances." The Court addresses these arguments together.

59. The Agreement is clearly titled as an Independent Contractor Agreement. (Agreement 1.) Beyond the title of the Agreement, the terms of the Agreement are clear. Haddock is referenced as "Contractor" throughout the Agreement. Importantly, the Agreement provides that "nothing in this Agreement shall be

construed as creating any other relationship" than that of an independent contractor. (Agreement § 9.)

60.     Although Attachment A to the Agreement references Haddock as a "local partner" and a "local developer partner," this vague use of the word "partner" in the Attachment to the Agreement and in communications between the parties, does not overcome the express provisions of the Agreement that provide that the terms of the Agreement shall not be construed as to create any other relationship between VOA and Haddock than that of an independent contractor. *See Crescent Foods, Inc. v. Evason Pharms., Inc.*, 2016 NCBC LEXIS 76, at *18 (N.C. Super. Ct. Oct. 5, 2016) (providing that where an agreement expressly identifies a party as an independent contractor, such language "weighs against any contention that the parties had a 'meeting of the minds' as to the formation of a partnership").

61.     While the Amended Complaint includes allegations that could establish that the parties contemplated a future partnership agreement and began negotiations to form a partnership, these allegations fall short of establishing that the parties formed a partnership pursuant to North Carolina law. The Amended Complaint makes clear that, despite Haddock's attempts to negotiate a partnership with VOA after she was informed that VOA did not intend to partner with her for the development of The Sussex, the parties never reached any agreement, other than as set forth in the Agreement itself, on the splitting of the Developer Fee or the profits of The Sussex. (Am. Compl. ¶¶ 58–65.) Failure to agree on the split of profits of any alleged partnership between the parties and failure to allege any other agreed-to

terms of a partnership arrangement is fatal to Plaintiffs' argument that the parties formed a partnership. *See Boyce v. McMahan*, 285 N.C. 730, 734 (1974) (providing that generally, "a contract, or offer to contract, leaving material portions open for future agreement is nugatory and void for indefiniteness"); *see also Compton v. Kirby*, 157 N.C. App. 1, 11 (2003) (providing that a partnership may be inferred when there is "a meeting of the minds with respect to the material terms of the partnership agreement"); *Wilder*, 101 N.C. App. at 202 ("[C]o-ownership and sharing of any actual profits are indispensable requisites for a partnership."). The parties did no more than express their intention to agree to form a partnership at some point in the future. (*See* Agreement Attach A.)

62. In sum, the conduct of and communications between the parties alleged by Plaintiffs in the Amended Complaint are insufficient to overcome the express language of the Agreement. *See La Familia Cosmovision, Inc. v. Inspiration Networks*, 2014 NCBC LEXIS 52, at *22 (N.C. Super. Ct. Oct. 20, 2014) ("The various verbal communications and representations referenced in the Amended Complaint, including casual references to a 'partnership' between the parties, are best viewed as circumstantial evidence that cannot overcome the explicit contractual language specifying Defendants as independent contractors rather than legal partners."). The Agreement expressly defines the parties' relationship: Haddock was acting as an independent contractor for VOA. Any modification to the parties' relationship as it pertains The Sussex was required to be in a signed writing pursuant to the terms of the Agreement. (Agreement §§ 4, 15.) Attachment A to the Agreement provides that

the parties "shall enter into a future binding agreement that specifies partnership scope[.]" No such written agreement or modification is alleged in the Amended Complaint or attached thereto.

63. The Amended Complaint and its attachments fail to establish the existence of a partnership carried on by the parties and thus Plaintiffs' first claim for relief to the extent it is based on a "breach of fiduciary duty as a partner" cannot survive the Motion to Dismiss. Accordingly, the Court GRANTS the Motion to Dismiss and dismisses Plaintiffs' claim for breach of fiduciary duty as a partner with prejudice.[6]

## 2. Negligence and Constructive Fraud

64. Plaintiffs' claims for negligence and constructive fraud rise or fall on the existence of a duty owed by Defendants to Plaintiffs. Plaintiffs, in support of their claims for negligence and constructive fraud, contend that they "have sufficiently alleged and the evidence overwhelmingly establishes that the parties entered into a partnership agreement, and as partners, Defendants were bound as a matter of law to fulfill certain fiduciary duties of trust and loyalty to Ms. Haddock and Cadence Development." (Resp. Mot. Dismiss 14.)

65. An essential element of a claim for constructive fraud is the existence of a fiduciary relationship. *Vanguard Pai Lung*, 2019 NCBC LEXIS 39, at *16. Similarly, to state a claim for negligence, a plaintiff must allege the existence of a legal duty. *Stein v. Asheville City Bd. of Educ.*, 360 N.C. 321, 328 (2006) ("To state a claim for common law negligence, a plaintiff must allege: (1) a legal duty; (2) a breach thereof;

---

[6] "The decision to dismiss an action with or without prejudice is in the discretion of the trial court[.]" *First Fed. Bank v. Aldridge*, 230 N.C. 187, 191 (2013).

and (3) injury proximately caused by the breach."). As the Court has already determined herein, Plaintiffs have not pleaded facts that support the existence of a fiduciary duty arising out of a partnership and there are no further allegations contained in the Amended Complaint that would create a fiduciary relationship between the parties; therefore, the breach of fiduciary duty claim should be DISMISSED. *See Edwards v. Mutter*, 2019 NCBC LEXIS 111, at \*10–11 (N.C. Super. Ct. Dec. 17, 2019) (dismissing a claim for breach of fiduciary duty when no *de jure* fiduciary relationship existed and the claimant failed to allege circumstances giving rise to a *de facto* fiduciary relationship).

66. To the extent Plaintiffs contend that the Agreement imposes a legal duty on Defendants, distinct from the formation of a partnership, to support their claims for negligence and constructive fraud, Plaintiffs' claims similarly fail. Plaintiffs allege that "[u]nder the Agreement and as partners, Defendants owed Plaintiffs a duty to exercise reasonable care in the performance of their development of The Sussex project and other partnership objectives." (Am. Compl. ¶ 104.) "Parties to a contract do not thereby become each others' fiduciaries; they generally owe no special duty to one another beyond the terms of the contract." *Highland Paving Co. v. First Bank*, 227 N.C. App. 36, 43 (2013) (cleaned up). "To state a viable claim in tort for conduct that is also alleged to be a breach of contract, 'a plaintiff must allege a duty owed to him by the defendant separate and distinct from any other duty owed under contract.' " *Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at \*48 (N.C.

Super. Ct. Nov. 3, 2011) (quoting *Kelly v. Georgia-Pacific LLC*, 671 F. Supp. 2d 785, 791 (E.D.N.C. 2009)).

67.   The Amended Complaint contains no other allegations of any other recognizable legal duty owed by Defendants to Plaintiffs, nor do Plaintiffs identify a separate and distinct duty in their briefing on this issue.   Therefore, the Court GRANTS the Motion to Dismiss Plaintiffs' negligence claim and constructive fraud claim and DISMISSES the claims with prejudice.

### 3.   Unfair and Deceptive Trade Practices

68.   To state a claim for a violation of N.C.G.S. § 75-1.1 ("UDTPA"), a plaintiff must allege that "(1) defendant committed an unfair and deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656 (2001).   "A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." *Id.*   Defendants contend that Plaintiffs' UDTPA claim should be dismissed, citing North Carolina law holding that a breach of contract, without more, is insufficient to support a UDTPA claim.   (Br. Supp. Mot. Dismiss 20.)

69.   "[A] mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. § 75-1.1." *Branch Banking & Tr. Co. v. Thompson*, 107 N.C. App. 53, 62 (1992); *see also SciGrip, Inc. v. Osae*, 373 N.C. 409, 427 (2020).   A UDTPA claim premised on a breach of contract must be accompanied by an aggravating circumstance. *Kerry Bodenhamer Farms, LLC v. Nature's Pearl*

*Corp.*, 2017 NCBC LEXIS 27, at *19 (N.C. Super. Ct. Mar. 27, 2017) (citing *Eastover Ridge, L.L.C. v. Metric Constructors, Inc.*, 139 N.C. App. 360, 368 (2000)).

70.    Such aggravating circumstances "generally involve forged documents, lies, and fraudulent inducements[,]" *Forest2Market, Inc. v. Arcogent, Inc.*, 2016 NCBC LEXIS 3, at *14 (N.C. Super. Ct. Jan. 5, 2016), and "[a]s a general proposition, unfairness or deception either in the formation of the contract or in the circumstances of its breach may establish the existence of a substantial aggravating circumstances sufficient to support an unfair and deceptive trade practices claim[,]" *SciGrip*, 373 N.C. at 426. "On the other hand, 'threats to terminate,' 'efforts to encourage' another to continue contractual performance while 'planning to breach,' and 'refusal to otherwise meet' contractual obligations do not rise to the level of aggravating circumstances.' " *Kerry Bodenhamer Farms*, 2017 NCBC LEXIS 27, at *19–20 (citing *Deltacom, Inc. v. Budget Telecom, Inc.*, U.S. Dist. LEXIS 54488, at *12–13 (E.D.N.C. May 20, 2011)); *see also Post v. Avita Drugs, LLC*, 2017 NCBC LEXIS 95, at *10–12 (N.C. Super. Ct. Oct. 11, 2017) (collecting cases on aggravating circumstances that may or may not support a UDTPA claim). "Thus, the North Carolina Court of Appeals has repeatedly stressed that a [UDTPA] violation 'is unlikely to occur during the course of contractual performance.' " *Post*, 2017 NCBC LEXIS 95, at *11 (citing *Heron Bay Acquisition LLC v. United Metal Finishing, Inc.*, 245 N.C. App. 378, 383 (2016)).

71.    Plaintiffs allege that Defendants' conduct constitutes "substantial evidence of repeated acts of bad faith, violations of this covenant in their dealings with Ms. Haddock, and evidence of substantial aggravating circumstances attending these

violations, the unfair dealings, and their tortious breach of the Agreement they made with Ms. Haddock." (Am. Compl. ¶ 107.) Plaintiffs further allege that in July 2019, well after the execution of the Agreement, Defendants devised a scheme to "oust" Plaintiffs from The Sussex. (Am. Compl. ¶ 108.) In other words, any alleged unfair and deceptive conduct by Defendants is related to their planned breach of the Agreement, which is insufficient to support a UDTPA claim. *See Post*, 2017 NCBC LEXIS 95, at *11. Upon careful review of the Amended Complaint, Defendants do not allege any aggravating circumstances sufficient to support the UDTPA claim premised entirely on a breach of contract.

72. Therefore, the Motion to Dismiss is GRANTED to the extent it requests dismissal of Plaintiffs' claim for unfair and deceptive trade practices and the claim should be DISMISSED with prejudice.

### 4. Constructive Trust

73. Defendants contend that "the Court should dismiss [Sussex VOA] as a Defendant in this case and deny Plaintiffs' request for a constructive trust remedy involving it." (Br. Supp. Mot. Dismiss 21.) It is Defendants' position that "[i]f Plaintiffs prove their case, then they would have an adequate remedy at law" in the form of a judgment against VOANS or VOA, making a constructive trust an unavailable remedy. (Br. Supp. Mot. Dismiss 21.)

74. As stated in the Initial Order and Opinion, a constructive trust "is a remedy which may or may not be available depending on the underlying causes of action." *Haddock,* 2021 NCBC LEXIS 8, at *19 (citing *Roper v. Edwards*, 323 N.C. 461, 464

(1988)). It is premature to make a determination as to which remedies, if any, Plaintiffs are entitled to, and the Court declines to do so on this Motion to Dismiss. Therefore, the Motion to Dismiss is DENIED to the extent it requests the Court deny Plaintiffs' request for a constructive trust.

75. Defendants also contend that "Plaintiffs' claims do not properly implicate ownership interests in [Sussex VOA] or its real or personal property." (Br. Supp. Mot. Dismiss 22.) Similarly, the Court concludes that it is premature to dismiss Sussex VOA from this action.

76. Plaintiffs allege that VOA formed Sussex VOA, VOA Defendants are members and managers of Sussex VOA, and VOA granted the deeds to the real property acquired by the exercise of Purchase Options for The Sussex to Sussex VOA. (Am. Compl. ¶¶ 6, 27, 78–79.) The Court cannot conclude at this stage of the proceeding that the surviving claims will not implicate Sussex VOA.

77. Therefore, the Court DENIES Defendants' request to dismiss Sussex VOA from this action.

## VI. CONCLUSION

78. For the foregoing reasons, the Court hereby **DENIES** the Motion to Strike and **GRANTS** in part and **DENIES** in part the Motion to Dismiss as follows:

A. Without concluding that the parties entered into a partnership agreement, the Court **DENIES** the Motion to Dismiss to the extent it requests dismissal of Plaintiffs' breach of contract claim based on Defendants' alleged breach of the Agreement.

B.      The Court **GRANTS** the Motion to Dismiss to the extent it requests dismissal of Plaintiffs' claims for breach of fiduciary duty as a partner, negligence, constructive fraud, and unfair and deceptive trade practices and **DISMISSES** Plaintiffs' claims for breach of fiduciary duty as a partner, negligence, constructive fraud, and unfair and deceptive trade practices with prejudice.

C.      The Court **DENIES** the Motion to Dismiss to the extent it requests dismissal of the remedy of a constructive trust.

D.      The Court **DENIES** the Motion to Dismiss to the extent it requests dismissal of Sussex VOA from this action.

79.    For clarity, upon entry of this Order and Opinion, the remaining claims in this action are: (1) the breach of contract claim to the extent it is based on a breach of the Agreement's payment terms; (2) unjust enrichment; and (3) breach of contract by repudiation.

      **SO ORDERED**, this the 25th day of August, 2021.

/s/ Michael L. Robinson
_____
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases